[Crim. No. 4339. Fourth Dist., Div. Two. June 25, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
BOBBY LEON JACKSON, Defendant and Appellant.

## COUNSEL

Ronald Steelman, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Joel S. Moskowitz, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**GARDNER, P. J.**—After a jury trial, defendant appeals from a judgment of conviction of Penal Code, section 273a and section 273d (child beating).

The defendant's first contention is that the court committed prejudicial error in allowing the testimony of a doctor concerning the "battered child

syndrome." An obvious answer to this contention is that no objection was made to this testimony. However, since it appears that under present procedures, appellate review is endless and if we dispose of the matter on that basis, we can realistically anticipate a collateral attack in which the defendant's appellate counsel is charged with inadequacy because of failure to charge trial counsel with inadequacy because the trial counsel failed to make the objection. Therefore, pragmatically, and since the problem has not before been presented on an appellate court level, we will discuss the contention.

Jo Anne Blanton lived with the defendant and had a 13-month-old child by him. One day she left the child with him while she went to work and when she returned in the evening, the child had burns and water blisters on his body. The defendant said something like "before you see him . . . don't get shook," and gave his explanation of what had happened. Since the child did not look too seriously injured to her, she put something on his burns and left for school, returning later in the evening. During the night the burns got worse and the next day the child was taken to see a doctor who examined the child but would not treat him for burns because the child had suffered a previous head injury. The child was then taken to a hospital. A pediatrician examined the child, found burns on the child's head and upper part of his back, a swollen forearm and distended abdomen and diagnosed an injury to the liver. He also saw a bruise suggestive of the shape of a thumb and one or two fingers on the child's body; he found that the child had suffered first and second degree burns over 23 percent of his body. X-rays revealed two recent fractures in the right forearm and one recent fracture in the left forearm. There were scratches on his right buttock and left leg. Further x-rays revealed ten broken ribs, five on each side, and the child was "near enough to death where it would not be any surprise if he expired at any time." The child had been admitted to the hospital three months before when he was diagnosed as having a subdural hematoma, a liquefied blood clot on the brain. The doctor was familiar with the elements of "battered child syndrome." This syndrome means that a child has received repeated and/or serious injuries by non-accidental means; characteristically, these injuries are inflicted by someone who is ostensibly caring for the child. There are several elements that are the criteria for the "battered child syndrome." They are (1) the child is usually under three years of age; (2) there is evidence of bone injury at different times; (3) there are subdural hematomas with or without skull fractures; (4) there is a seriously injured child who does not have a history given that fits the injuries; (5) there is evidence of soft tissue injury; (6) there is evidence of neglect. The doctor found these indicia present in the baby's history in the instant case.

A finding, as in this case, of the "battered child syndrome" is not an opinion by the doctor as to whether any particular person has done anything, but, as this doctor indicated, "it would take thousands of children to have the severity and number and degree of injuries that this child had over the span of time that we had" by accidental means. In other words, the "battered child syndrome" simply indicates that a child found with the type of injuries outlined above has not suffered those injuries by accidental means. This conclusion is based upon an extensive study of the subject by medical science. The additional finding that the injuries were probably occasioned by someone who is ostensibly caring for the child is simply a conclusion based upon logic and reason. Only someone regularly "caring" for the child has the continuing opportunity to inflict these types of injuries; an isolated contact with a vicious stranger would not result in this pattern of successive injuries stretching through several months.

Evidence Code section 801, provides the standards for the admission of expert testimony and it is clear that the doctor's testimony in this case comes well within that section. ■ An expert medical witness may give his opinion as to the means used to inflict a particular injury, based on his deduction from the appearance of the injury itself. (*Estate of Rowley*, 257 Cal.App.2d 324, 340 [65 Cal.Rptr. 139].) ■ A medical diagnosis based on probability—as is the case with the "battered child syndrome" diagnosis—is admissible; the lack of scientific certainty does not deprive the medical opinion of its evidentiary value. (*Travelers Ins. Co.* v. *Ind. Acc. Com.*, 33 Cal.2d 685, 687 [203 P.2d 747]; *Estate of Rowley, supra.*)

■ Whether to admit such testimony is, of course, within the discretion of the trial court. However, the diagnosis of the "battered child syndrome" has become an accepted medical diagnosis. (See Morris J. Paulson and Phillip R. Blake, *The Abused, Battered, and Maltreated Child: A Review*, 9 Trauma No. 4; A. McCoid, *The Battered Child and Other Assaults upon the Family: Part One*, 50 Minn. L. Rev. 1; Reporting of Child Abuse, 22 Assembly Interim Com. Report No. 8, Part 5, Criminal Procedure (1963-1965) p. 69; found in Appendix to the Journal of the Assembly, Regular Session 1965, Vol. 2; *The California LegislativeApproach to Problems of Willful Child Abuse*, 54 Cal. L. Rev. 1805, 1807.)

Contrary to the appellant's contention, there is nothing in the doctor's testimony which indicated a belief on the part of the doctor that the defendant was guilty of the offense. Counsel for the defendant obviously was aware of the clear admissibility of this type of testimony and did not see fit to make a useless objection to it. Trial courts have long recognized the "battered child syndrome" and it has been accepted as a legally qualified

diagnosis on the trial court level for some time although it has not as yet received appellate approval. Therefore, counsel did not see fit to interpose a useless objection to its admission but chose to counteract it with medical testimony of his own which was certainly a proper trial tactic. He presented a doctor who testified that he "guessed" there was between a 60 to 70 percent chance of this being a battered child case. This strategy on the part of the defendant's attorney at least allowed him to argue the baby was not suffering the "battered child syndrome" as the first pediatrician had said.

■ The admission into evidence of the doctor's diagnosis of a "battered child syndrome" was not an improper invasion of the province of the jury.

The defendant's next contention is that the trial court abused its discretion in limiting certain testimony.

The defense was a denial on the part of the defendant that he had beaten the child and an effort to cast suspicion on the child's maternal grandmother and maternal aunt who took care of the child from time to time.

A friend of the family testified that the child was often left with the maternal grandmother, that the maternal grandmother was subject to fits or seizures, made strange noises, had been in a mental institution, and walked around the house swearing and yelling at people for no reason at all; that Carol Blanton, the child's aunt who sometimes took care of the baby, used drugs or narcotics. Jo Anne Blanton was called as a witness for the defendant and she, too, testified that her mother was subject to fits, that she "shakes a lot" and "it's like she's in a world of her own," that she "shakes all over, and her arms go up and down and all over and she slaps at her head and grabs her hair and pulls her hair sometimes," and "when she's around water, it really upsets her." Counsel was then going into more details concerning the weird behavior of the grandmother and the court suggested an offer of proof. After this offer, the trial court exercised its discretion under Evidence Code section 352, and limited further examinations of the child's mother in this respect. There was already ample testimony that the grandmother displayed bizarre behavior and was probably a mental case and that the sister was a narcotic addict. Further evidence along this line would have been cumulative. On the offer of proof, there was nothing to indicate that any of this bizarre behavior resulted in any injury to the child and in a discussion concerning the aunt, matters went so far as to suggest that she, the aunt, had died of an overdose of narcotics. This could have had little effect upon the jury's consideration of defendant's guilt since the jury already knew she used narcotics. At this point, the district attorney rose to the occasion and offered to prove that the defendant had beat up the mother to indicate the defendant's

violent propensities. The trial court could see that pursuing the matter further was going to contribute much heat but little light to the case and exercised excellent discretion in terminating any further examination along these lines or further exploration into these issues by either party. The mother then continued to testify fully as to all the facts and circumstances connected with the case. ■ We find no abuse of discretion on behalf of the trial judge in limiting further examination at this point.

We would observe that the administration of justice would greatly benefit if more trial judges made use of their inherent powers as codified in Evidence Code section 352, to control and, if necessary, terminate repetitious, time consuming and irrelevant testimony. If they would do so, it would enhance and perhaps restore in the eyes of the public the image of the court as being an institution for the expeditious, fair and orderly ascertainment of the truth.

Because of conditions created by the law explosion, the concept of a kindly, benign trial judge who listens passively and patiently while the lawyers try their cases without his interference is no longer valid—if it ever was. ■ To be a real factor in the administration of justice, a trial judge must alertly supervise proceedings in his court, curbing when necessary over-zealous advocates and, in his rulings on evidence strike a "careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption." (*People* v. *Lavergne,* 4 Cal.3d 735, 744 [94 Cal.Rptr. 405, 484 P.2d 77].) Lawyers are advocates. Asking them to police themselves is not fair. Admitting *all* evidence which has any probative value is sometimes unnecessary to the orderly ascertainment of the truth. The judicious use of the inherent powers of the court, set forth in Evidence Code, section 352, is to be encouraged.

Judgment affirmed.

Kerrigan, J., and Tamura, J., concurred.