STATE

v.

**Dawn Ellen DURAND.**

**No. 82–190–C.A.**

Supreme Court of Rhode Island.

Sept. 2, 1983.

Dennis J. Roberts II, Atty. Gen., Judith Crowell, Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Chief Appellate Atty., Providence, Janice M. Weisfeld, Asst. Public Defender, for defendant.

## OPINION

SHEA, Justice.

This matter is before the Supreme Court on appeal of the defendant who was found guilty of manslaughter in the death of her four-and-one-half-month-old son, Douglas. The trial justice denied her motion for new trial and sentenced her to imprisonment for a period of twenty years with five years suspended. She has appealed to this court, alleging that erroneous instructions were given by the trial justice to the jury. We affirm the judgment below.

Douglas Durand was born on July 21, 1980. His brief and unfortunate life ended some time between 10 p.m. on December 9 and 8:30 a.m. on December 10, 1980. The evidence established that at about 9 a.m. on December 10, 1980, the Cumberland police department dispatched a rescue team to the home of defendant in response to a telephone call. Upon arrival, they found the baby, Douglas Durand, dead in his crib. The child's body was transported to the State Medical Examiner's Office where an autopsy revealed a massive skull fracture as well as healing fractures of the clavicle and of approximately ten ribs. The skull fracture was accompanied by extensive subgaleal hemorrhage (bleeding between the outer skull surface and the overlying skin), which extended from ear to ear over the top of the skull as well as forward beneath the skull, and extensive subdural bleeding (bleeding in the area between the skull and the brain). External examination disclosed bruises and pinpoint hemorrhages near the left eye and below the left ear, bruising of the left temporal area, and crepitance, that is, movement of the fractured bones of the skull. There were two dark bruises over the front of the chest. The autopsy further disclosed blood in the soft tissues and muscles surrounding the right kidney, an abscess in the area of the stomach and pancreas, two healing lacerations of the liver, and an infarction of the caudate (middle) lobe of the liver. Time of death was estimated to be sometime during the evening of December 9.

At trial, the medical examiner testified that the infant was a victim of homicide and that the underlying cause of death was Child Abuse Syndrome, which he described as death caused to a child by repeated episodes of abuse and repeated injury. He based this conclusion on the fact that most of the injuries occurred over a period of weeks or months. The bone fractures were relatively old and in varying stages of the healing process. The doctor estimated that the injury to the liver was more recent, probably only two weeks old. He stated, however, that the precipitating cause of death was the fracture of the skull, which would have caused almost immediate unconsciousness and death within thirty minutes, or forty-five minutes at the most.

At trial, Marcel J. Durand and his wife, Josephine, father-in-law and mother-in-law of defendant, testified that they had visited defendant and her two children on December 9, 1980, the morning before the infant's death, at about 11 a.m. The grandfather testified that the baby appeared well, lying in his crib smiling and drinking orange juice from a nursing bottle, and that no injuries were visible. Mr. Durand testified that defendant called them the next day, December 10, at 9 a.m., and told them that something was wrong with Douglas. They im-

mediately went to defendant's home where, upon arrival, Mr. Durand called for a rescue squad.

Douglas Durand, defendant's husband and father of the victim, testified that he had been separated from his wife for three months at the time of the baby's death. He lived in South Attleboro, Massachusetts, a few minutes away from defendant's home. He stated that on December 10, he arrived at defendant's house at about 9:45 a.m., having been summoned there by his father.

Gilberto Rei, aged fourteen, testified that he had taken care of Douglas and Christine, Douglas's two-year-old sister, on the evening of December 9 between 7 and 9 p.m. while defendant did some shopping. When he arrived to babysit at 7 p.m., Christine was up, but Douglas was in his crib. He stated that he spent the early evening watching television with Christine. At one point, upon hearing Douglas cry a little, Gilberto went to the child's crib. He noticed the baby move his arm and heard him make a "little grunt." He assumed that the baby was all right and returned to watch television with Christine until the defendant returned home.

The defendant gave a statement at the Cumberland police station during the afternoon of December 10 after being advised of her constitutional rights. She indicated that Douglas appeared all right when she put him to bed on the evening of December 9 between 6:30 and 6:45 p.m. She gave him a bottle in bed before the babysitter arrived at 7:00. She said that the babysitter was very good with the children. She left and did some shopping at local stores, traveling by foot. Upon arriving home at around 9 p.m., she looked in on the baby, who was breathing fine. She again checked the baby when putting Christine to bed at 10 p.m., and again he was all right. She added that no one else was in the house after 9 p.m., which was the time the babysitter left. The next morning, she arose at about 8:30 a.m. and went to the childrens' bedroom. Upon seeing that Christine was already up and in the bathroom, she looked in the crib

at Douglas. He was cold and stiff. She banged on his chest and tried to give him mouth-to-mouth resuscitation, to no avail.

In her statement, defendant also added that Douglas had no history of medical problems; he never had been hospitalized or treated by a doctor for any injuries. He had seen his attending physician four times in his life, the last visit having been approximately a week before the date of death. She denied ever having caused or wanting to cause the baby any physical harm. When asked whether or not she had any idea how Douglas could have been injured, she replied that on the day before, December 9, the baby had been sitting on the kitchen table in an infant's seat when her daughter Christine took him out and dropped him on the kitchen floor. The defendant picked the baby up immediately, and he stopped crying and smiled. She said there had been a few other occasions when Christine had dropped Douglas, but he had always landed on the rug.

Following that statement, Detective Ditano of the Cumberland police spoke with defendant's husband. Mr. Durand inquired of the officer the cause of his son's death. The officer replied that the only one who would have the answer would be defendant. He also said that the medical examiner's initial report on the baby's fatal injuries did not coincide with what defendant had to say. Ditano suggested that he, Durand, should talk to his wife.

The following day, December 11, Durand called Detective Ditano to request a meeting and added that he had some information that could be the answer to how the death had occurred. An appointment was made for the next day, late enough for the Durands to attend the baby's funeral. On that day, defendant gave a second statement after again being advised of her constitutional rights. This time she narrated a somewhat different version of the events of the morning of December 9. She repeated that her daughter Christine had taken Douglas off the kitchen table and dropped him on the floor, indicating that she herself

was cleaning the bathroom at the time. As in her previous statement, she said that she immediately picked Douglas up off the kitchen floor and that he seemed to be all right. She added that she held Douglas in her arms while she finished cleaning the bathtub. She said that her hands were soapy and that Douglas slipped out of her arms and fell between the tub and the toilet, hitting his head on the rim of the tub. She quickly picked him up and checked his head to see if he was injured. Finding no injuries, she concluded that Douglas was all right, especially since he had again stopped crying and was smiling. She estimated that this fall occurred some ten to fifteen minutes after Christine had dropped Douglas in the kitchen.

She described the rest of the day as routine. Douglas appeared normal and alert until he was put to bed for the night at around 6:40. She stated that the baby neither vomited after having been dropped nor cried for any unusually long period of time. She reiterated how she again looked in on the baby after returning from shopping. She stated that she again checked him before going to bed herself, taking the blanket off him and lightly touching his back. It was not until the next morning, she said, that she realized something was wrong.

She explained that she did not say anything previously about dropping the baby in the bathroom because she was afraid people would wonder why she had not brought the baby to the hospital. When questioned about the bruises on the baby's face which were not visible when the grandparents had visited the day before the baby's death, defendant said that they appeared in the afternoon when Christine threw a toy at Douglas. She added that from time to time she had found Christine's toys in the baby's crib. The defendant related that Christine had become jealous of Douglas after Christine had been moved to a bed and Douglas had been placed in her crib. At times she found Christine sleeping in the crib, having climbed in on her own, and at other times Christine was found jumping up and down

in the crib while the baby was in it. At no time during the questioning, however, did the defendant specifically state that Christine inflicted any serious injury on Douglas. Further, the defendant denied that she inflicted any of the injuries that were found.

On appeal, the defendant asserts that the trial justice's jury instructions were so erroneous, defective, and prejudicial as to deny her her constitutional rights to a fair trial and to due process of law.

First, defendant argues that her defense was based on the premise that the baby's death might have been caused accidentally by her two-year-old daughter, Christine. Alternatively, defendant argues that she raised the possibility that she might have caused the infant's death accidentally by dropping Douglas on the edge of the bathtub. She claims, therefore, that she was entitled to an accident instruction. The defendant relies principally on *State v. Butler,* 107 R.I. 489, 268 A.2d 433 (1970). In *Butler,* the victim, Sheridan, was found unconscious in a vacant lot. He died twenty-seven hours later without having regained consciousness. The defendant, Butler, first gave a statement to the police that she had pushed Sheridan down, had hit him with a stone, and had emptied his pockets. At trial, she denied having given that statement and objected to its admission. Rather, she testified that Sheridan, who was intoxicated, wanted to relieve himself so she accompanied him into the lot to be sure that he would not stumble and fall. However, Sheridan suddenly grabbed her from behind by the throat. She panicked and pushed him to the ground, where they struggled. She freed herself and ran to the car. The medical examiner's findings were less consistent with a fall than with injuries inflicted by a rock. There was a great deal of undisputed evidence corroborating the statement the police had taken. The trial justice declined to charge the jury on self-defense as requested by the defendant. On appeal, this court said:

"The fact that a trial justice does not believe the accused's defense does not

alter his obligation to submit such defense to the jury under proper instructions * * *. However slight and tenuous the evidence may be on which the self-defense hypothesis is advanced, it is nevertheless there for the jury's consideration, and the fair trial concept requires that the jury consider it under an appropriate instruction." *State v. Butler,* 107 R.I. at 495–96, 268 A.2d at 436–37.

In *Butler,* the defendant testified specifically to facts that entitled her to a self-defense instruction. The situation in this case is entirely different.

■ The uncontradicted evidence in this record is that the injury causing death was a massive skull fracture that would cause unconsciousness almost immediately and death within thirty to forty-five minutes. The defendant herself established that the baby was awake and smiling, able to eat and drink from his bottle, and not debilitated in any way during the day and most of the night after Douglas had been dropped. These occurrences were apparently not severe or serious enough to cause a visible bruise or blemish on the infant's head since none were visible to the grandparents who visited two hours after these events. On the basis of the evidence, neither of these incidents could have caused the fatal injury. Under the circumstances, an instruction on accident was unwarranted. It is well settled that a jury's attention should not be focused on propositions of law that are not supported by the evidence. *State v. Infantolino,* 116 R.I. 303, 355 A.2d 722 (1976); *State v. Crough,* 89 R.I. 338, 152 A.2d 644 (1959). A criminal defendant is entitled to instructions that explain those propositions of law which relate to the material issues of fact that the evidence tends to support. *State v. D'Alo,* R.I., 435 A.2d 317 (1981); *State v. Infantolino,* 116 R.I. at 307, 355 A.2d at 724. We have reviewed the other cases cited by defendant and conclude that they are not applicable.

■ Furthermore, the suggestion that two-year-old Christine caused the victim's death would not require an accident instruction in this defendant's trial. An accident defense amounts to what was called at common law plea of confession and avoidance. In this case it would mean that the defendant says "Yes, I did it, but it was an accident and therefore I am not criminally responsible." The theory that the child Christine was responsible for Douglas's death would not be an "accident" in regard to this defendant. In any event, that theory was adequately covered by the trial justice's instructions that stated in part:

"[i]f you are satisfied, * * * beyond a reasonable doubt that this killing was unlawful *and this killing was done by this defendant * * *.*" (Emphasis added.)

This instruction informed the jury that it would have to be convinced beyond a reasonable doubt that defendant, and not Christine, did the killing in order to return a guilty verdict.

■ The defendant also asserts that a portion of the instruction given by the trial justice invaded the province of the jury and deprived her of a fair trial. The challenged instruction was as follows:

"Now, it is well settled in matters of homicide * * * that one who wantonly or recklessly does an act that results in the death of another is guilty of manslaughter, although he did not contemplate such a result. Nothing more is required than the intentional doing of an act which by reason of its wanton or reckless nature exposes another to injury and causes him such injury.

"When a crime is one of infanticide, or child abuse, evidence of repeated incidents is especially relevant because it may be the only evidence to prove the crime. When an adult, * * * has sole custody of a child for a period of time, and during such time, the child suffers wounds which are neither self-inflicted nor accidental, *if you find such evidence,* that evidence would be sufficient to *allow* the jury to infer that the adult inflicted the injuries." (Emphasis added.)

The defendant first contends that the instruction impermissibly connotes that she, as the adult custodian, was responsible for injuries that may have been caused by Christine. This argument, we believe, is adequately addressed in the above-quoted portion of the instruction in which the trial justice informed the jurors that they had to be satisfied beyond a reasonable doubt not only that the killing was unlawful but that the killing was done by defendant. This particular argument therefore does not require further discussion.

■ She next argues that the fact that an adult is a child's sole custodian is not, in itself, a sufficient basis from which to draw an inference that the adult inflicted the injuries on the child. It is well settled that a factfinder may always draw inferences from the evidence presented, but the inferences must be based on some evidence, either direct or circumstantial. *In re Pereira,* 111 R.I. 712, 715, 306 A.2d 821, 823 (1973); *State v. Koohy,* 105 R.I. 197, 202, 250 A.2d 711, 714 (1969). The testimony of the medical examiner supports a finding that "these wounds" on Douglas to which the trial justice's instruction alluded were neither accidental nor self-inflicted. In fact, the medical examiner provided direct evidence of the cause of death, stating Douglas was a victim of Child Abuse Syndrome.

Generally, other jurisdictions have recognized Child Abuse Syndrome and have stated:

"This syndrome means that a child has received repeated and/or serious injuries by non-accidental means; characteristically, these injuries are inflicted by someone who is ostensibly caring for the child. There are several elements that are the criteria for the 'battered child syndrome.' They are (1) the child is usually under three years of age; (2) there is evidence of bone injury at different times; (3) there are subdural hematomas with or without skull fractures; (4) there is a seriously injured child who does not have a history given that fits the injuries; (5) there is evidence of soft tissue injury; (6)

there is evidence of neglect * * *." *People v. Jackson,* 18 Cal.App.3d 504, 506, 95 Cal.Rptr. 919, 921 (1971).

The medical examiner provided testimony supporting his diagnosis that Douglas's death met each of the elements of this syndrome. He initially indicated that the injuries in this case could be separated into several time segments. The fractures he found were relatively old and were in the process of healing. He concluded that the lacerated liver was at least weeks old since the healing process had started but was not so advanced as the healing process in the bones.

However, he estimated that the head injuries were sustained very close to the time of death. They were so severe that they would have caused almost immediate unconsciousness, and death would have followed within a short period, thirty to forty-five minutes at the most. The medical examiner was questioned at length about the method or manner of force that would be necessary to cause a fatal skull fracture like the one found in the autopsy. He explained that babies often suffer serious head injuries but do not suffer fractures of the skull because at Douglas's age the skull bones are very pliable. For this reason, children more often suffer internal bleeding than skull fractures. He stated that very considerable force was therefore necessary to inflict the skull fracture found on this child. The medical examiner said the injury could have happened in a couple of ways. The doctor said he had been contacted by the police about the mother's statement that she had dropped Douglas on his head, causing it to contact the bathtub, the day prior to death. However, it was his opinion that the injuries were not consistent with that type of fall. First, he posited that if dropped, the baby would have had to have been dropped almost directly on the top of its head. He explained that the injury found was not consistent with normal dropping. In order to get such an injury to the top of the head, the infant would have had to have been suspended by the heels and dropped directly

on his head. Here, there was no evidence of external bruises or abrasions. He also added that the amount of force necessary to create the massive type of skull injuries found on the infant was not consistent with simple dropping.

Another method would be a gradual application of a crushing force with a soft object. In the medical examiner's opinion, this second method, rather than a dropping, was more consistent with the injuries sustained because there was no significant exterior manifestation of a blow from any physical object. He testified that the only external finding was a very faint bruise, so inconspicuous that it was not visible to the people at the scene when the body was found.

The medical examiner also gave his opinion regarding the causes of the other injuries Douglas had suffered. He indicated that the laceration of the liver would have had to have been caused by a severe blow from a blunt force applied from front to back at the side of the abdomen. The force used would have had to have been blunt force, not sharp force. Questioned further, he said that the blunt force could have been supplied by hitting with a fist, a foot, or an object—the leg of a chair or a toy. He explained that the injury to and the blood around the right kidney would also have had to result from a significant amount or degree of trauma, in that instance applied from back to front.

The fracture to the clavical and one rib fracture appeared to have the same amount of calcium formation, indicating the same age. The remaining rib fractures appeared to be slightly younger but not significantly so. It was impossible to tell if all of the remaining rib fractures were suffered at the same time. Significant force would have been required to cause the rib fractures primarily because the ribs and bones of a child of this age are pliable and the type of force would have to be a crushing or squeezing one.

On cross-examination, the doctor acknowledged that child abuse does not have to be inflicted by an adult, rather, another child can be involved. He admitted that the application of a crushing type of force gradually applied to the infant's head by a soft object could have been consistent with the use of a baby's bottle or with a twenty-five-pound two-year-old's sitting on the infant's head while the infant was in the crib. He added that these head injuries could be consistent with the application of a pillow or some other relatively soft object applied with considerable force to the baby's head.

The medical examiner acknowledged that medical literature contained reports of child abuse such as head injuries inflicted by young children, but he said there were distinguishing facts between cases reported in the literature and this case. The biggest distinction was the absence in those cases of numerous injuries occurring over an extended period. Most of the cases reporting other children as the abusive party involved only injuries occurring shortly before death. Furthermore, the doctor did not recall any reported cases of injuries to a young child which were inflicted by a child as young as Christine.

Other states have had occasion to consider the battered-child syndrome, or Child Abuse Syndrome, as the cause of death of minor children in criminal prosecutions in which there were no witnesses either to the final fatal injury or to the earlier injuries. We acknowledge, as have other jurisdictions, that it is very difficult in a prosecution for abuse and death of minor children to establish the guilt of a defendant other than by circumstantial evidence because normally, as in this case, there are no eyewitnesses. *State v. Loss,* 295 Minn. 271, 204 N.W.2d 404 (1973). Today, we join with other courts who have held that where the elements of Child Abuse Syndrome have been established, these circumstances *permit* an inference to be drawn that the child's sole custodian inflicted the injuries. Where evidence of this syndrome is presented,

"[t]he additional finding that the injuries were probably occasioned by someone

who is ostensibly caring for the child is simply a conclusion based on logic and reason. Only someone regularly 'caring' for the child has the continuing opportunity to inflict these types of injuries; an isolated contact with a vicious stranger would not result in a pattern of successive injuries stretching through several months." *People v. Jackson,* 18 Cal. App.3d at 507, 95 Cal.Rptr. at 921.

In *Jackson,* as in the case before us, the defendant, the father of the infant victim, attempted to cast suspicion on others, namely, the child's grandmother and aunt. The grandmother was obviously mentally ill and subject to bizarre and violent behavior, and the aunt was a known drug user who, it was intimated, had died of an overdose by the time of trial. These two people were babysitters for the child from time to time. Although the appeal raised other issues, circumstantial evidence, even in the face of potential injury by other care givers, was sufficient to support a guilty verdict.

*State v. Goblirsch,* 309 Minn. 401, 246 N.W.2d 12 (1976), is a case in which the essential facts are almost identical to the case before us except that both parents were residing in the home at the time of injury. The mother testified for her husband, the defendant, in a trial where evidence of battered-child syndrome was introduced. On appeal the defendant argued that the evidence was insufficient to support the jury's finding because it was not conclusively shown that he was the sole person having custody of the child at the time of the fatal injury. Considering the evidence, the court held that the head injury was not accidental and that it had occurred minutes to hours prior to death, during a time that the victim was attended solely by the defendant. Other circumstantial evidence, such as the periodic absence of the mother because of work and the defendant's inability to offer an explanation of the other serious traumatic injuries found, reasonably supported an inference of the defendant's guilt, and the jury was jus-tified in reaching the verdict it did. *Id.* at 406, 246 N.W.2d at 15.

In the case before us defendant testified fully about Christine's conduct and attitude toward Douglas. If the jurors believed that evidence, they would have had to find defendant not guilty because they were specifically instructed that they must find "that the defendant did the killing." As far as drawing an inference of defendant's guilt from the evidence was concerned, we believe the jury was justified.

Our review of the record persuades us that every element or criteria establishing Child Abuse Syndrome was established, some of it by the defendant herself. Douglas was under three years of age. There was clear, uncontradicted evidence of bone injury suffered at different times. The fatal injury was a massive skull fracture with subdural hematoma. The infant suffered soft tissue injuries in the abdomen and in the area of a kidney. Douglas was a seriously injured child for whom no history was given by his mother which would satisfactorily explain any of the injuries. In regard to the element of neglect, it is clear that when a four-and-one-half-month old infant dies an apparently violent death and is found to have suffered numerous, serious, and undoubtedly painful injuries in its short life, including eleven or more fractures of bones and a severe liver injury, all of which went medically unattended, the inference of outrageous neglect, if not incredible cruelty, is almost inescapable. Finally, the conclusion that the injuries were caused by the only person in whose custody the child lived flows logically from the totality of the circumstances. The jury was fully justified in concluding that a caring parent would not only have been aware of such serious injuries if they had been inflicted by someone else but would have sought proper medical treatment for them.

For these reasons, we believe that there was no error in the instruction given to the jury. The defendant's appeal is denied and dismissed, the judgment appealed from is

affirmed, and the papers of this case are remanded to the Superior Court.