**In re ADNER G. et al.**

**No. 2006–166–Appeal.**

Supreme Court of Rhode Island.

June 29, 2007.

William Elderkin, Jr., Esq., for Petitioner mother.

Janet Gilligan, Esq., for Petitioner father.

Karen M. Clark, Esq., Providence, for DCYF.

Frank P. Iacono, Jr., Esq., for CASA.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

Ligia Delgado and Jaris Garcia appeal from a decree of the Family Court that temporarily placed their infant child, Jadnerisse G., and her two-year-old brother, Adner G., in the custody of the Department of Children, Youth, and Families (DCYF). The basis for this placement was a finding by a Family Court trial justice that the couple had abused and neglected Jadnerisse and neglected Adner, and that, therefore, placement with DCYF was warranted. This case came before the Supreme Court for oral argument on May 15, 2007, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not

summarily be decided. After hearing the arguments and examining the memoranda filed by the parties, we are of the opinion that cause has not been shown and we proceed to decide the appeal at this time without further briefing or argument. For the reasons stated in this opinion, we vacate the Family Court's finding that Delgado and Garcia abused Jadnerisse.[1]

## Facts and Travel

On August 11, 2005, Ligia Delgado brought her seven-week-old infant, Jadnerisse G., to Hasbro Children's Hospital because the child was suffering from a severely swollen right leg. The medical examinations and testing revealed that the swelling of Jadnerisse's right leg was due to proximal and distal tibia fractures and that the infant had numerous other fractures that were in various stages of healing. The physicians concluded that all the baby's horrifying injuries were the result of non-accidental trauma. In short, the doctors found that Jadnerisse was a victim of child abuse.

On August 15 2005, DCYF filed abuse and neglect petitions[2] regarding Jadner-

---

1. We note at the outset that the trial justice's finding of neglect with respect to both children has not been challenged. Therefore, the propriety of that ruling is not before us.

2. The petitions were brought under G.L.1956 chapter 1 of title 14 and G.L.1956 chapter 11 of title 40. Section 14–1–3(8) says:
    " 'Neglect' means a child who requires the protection and assistance of the court when his or her physical or mental health or welfare is harmed or threatened with harm when the parents or guardian:
    "(i) Fails to supply the child with adequate food, clothing, shelter, or medical care, though financially able to do so or offered financial or other reasonable means to do so;
    "(ii) Fails to provide the child proper education as required by law; or
    "(iii) Abandons and/or deserts the child."
    Section 40–11–2(1) says:
    " 'Abused and/or neglected child' means a child whose physical or mental health or welfare is harmed or threatened with harm when his or her parent or other person responsible for his or her welfare:
    "(i) Inflicts or allows to be inflicted upon the child physical or mental injury, including excessive corporal punishment; or
    "(ii) Creates or allows to be created a substantial risk of physical or mental injury to the child, including excessive corporal punishment; or
    "(iii) Commits or allows to be committed, against the child, an act of sexual abuse; or
    "(iv) Fails to supply the child with adequate food, clothing, shelter, or medical care, though financially able to do so or

offered financial or other reasonable means to do so; or
    "(v) Fails to provide the child with a minimum degree of care or proper supervision or guardianship because of his or her unwillingness or inability to do so by situations or conditions such as, but not limited to, social problems, mental incompetency, or the use of a drug, drugs, or alcohol to the extent that the parent or other person responsible for the child's welfare loses his or her ability or is unwilling to properly care for the child; or
    "(vi) Abandons or deserts the child; or
    "(vii) Sexually exploits the child in that the person allows, permits or encourages the child to engage in prostitution as defined by the provisions in § 11–34–1 et seq., entitled 'Prostitution and Lewdness'; or
    "(viii) Sexually exploits the child in that the person allows, permits, encourages or engages in the obscene or pornographic photographing, filming or depiction of the child in a setting which taken as a whole suggests to the average person that the child is about to engage in or has engaged in, any sexual act, or which depicts any such child under eighteen (18) years of age, performing sodomy, oral copulation, sexual intercourse, masturbation, or bestiality, or
    "(ix) Commits or allows to be committed any sexual offense against the child as such sexual offenses are defined by the provisions of chapter 37 of title 11, entitled 'Sexual Assault', as amended; or
    "(x) Commits or allows to be committed against any child an act involving sexual penetration or sexual contact if the child is under fifteen (15) years of age; or if the

isse and Adner based on the findings of the doctors with respect to Jadnerisse's injuries, and both were temporarily removed from their parents' home by DCYF, pending a hearing on the matter. On February 6, 2006, a trial justice of the Family Court conducted a hearing to determine the merits of the petitions.

Delgado testified at the commitment hearing that Jadnerisse was born on June 23, 2005, and lived at home with her, Garcia (Jadnerisse's father), and their son, Adner, until the children were removed by DCYF as a result of the August 11, 2005 hospital findings. There was testimony that during the first three weeks of Jadnerisse's life, Garcia worked full time for a cable television company while Delgado stayed at home and cared for both children. However, just three weeks after the birth of Jadnerisse, financial difficulties necessitated that Delgado begin looking for a full-time job. Her employment search was successful, and in anticipation of her new work schedule, she and Garcia also began looking for a suitable daycare provider for Jadnerisse and Adner. Jadnerisse was too young for most daycare facilities, Delgado said, but she secured a provider who had been licensed by DCYF

to handle infants of Jadnerisse's age—her own step-mother.[3]

Delgado testified that her work, domestic, and daycare schedules were uneventful for about four weeks. Delgado said that Garcia would drive her and the children to daycare in the morning and drop them off before going to work. From there, Delgado would get a ride with her father, with whom she worked, to their mutual place of employment. At the end of her work day, at approximately 3:30 p.m., Delgado would get a ride back to the daycare facility from her father so that she could get her children.

Delgado also testified to a normal home life. She and Garcia shared the demanding responsibilities of parenting,[4] and with the exception of work hours, Delgado and Garcia were never apart from Jadnerisse.[5] However, Delgado also testified that, since the time of Jadnerisse's birth, she had been concerned about how much the baby cried. After consulting various medical professionals on numerous occasions, Delgado was assured that the baby was in good health and that the crying was normal.[6]

child is fifteen (15) years or older, and (1) force or coercion is used by the perpetrator, or (2) the perpetrator knows or has reason to know that the victim is a severely impaired person as defined by the provisions of § 11–5–11, or physically helpless as defined by the provisions of § 11–37–6."

3. It was later discovered that, unknown to Delgado and Garcia, the provider's license had expired at the time they brought Jadnerisse and Adner in for daycare. Indeed, the daycare provider was closed by the state immediately once this omission was discovered. Further, although the reason is not entirely clear from the record, it seems that the daycare facility has remained closed by the state because of the suspicion of abuse in this case.

4. For example, the couple testified that when the baby cried during the night, Delgado at-

tended to the baby while Garcia readied a bottle for feeding. Also, they testified that many times Garcia attempted to console the baby by singing to her.

5. Delgado and Garcia both testified that Garcia was alone only once (for a period of three to five minutes) with Jadnerisse during the seven weeks in which Jadnerisse lived with them. This was so, Delgado testified, because Garcia did not feel comfortable handling small infants by himself. The trial justice found this troubling.

6. During the hearing, there was substantial testimony and discussion about whether Adner and/or Jadnerisse ever were diagnosed as colicky. Apparently, Jadnerisse cried a lot, as had Adner while he was an infant. Concerned with the extent of their crying, Delga-

Life changed on August 11, 2005. Delgado testified that at approximately 1 p.m. on that day, while she and her father were at work, her father approached her and asked whether Jadnerisse had been vaccinated recently. Delgado responded that she had not, and she asked why her father was inquiring. At first, her father would not respond to her question and instead told her to "take [her] lunch." However, Delgado testified that she refused, and she demanded to know what was going on with her daughter. Her father then revealed that his wife (the daycare provider) had called him and told him that Jadnerisse had a swollen leg. Although she was forced to wait until 4 p.m. to retrieve Jadnerisse,[7] Delgado testified that after she saw the condition of the child, she brought her directly to Hasbro Children's Hospital.

Nancy Harper, M.D., an expert in forensic pediatrics (known as child abuse pediatrics) also testified at the commitment hearing. She said that on August 11, 2005, she examined Jadnerisse at Hasbro after Jadnerisse first had been examined by resident doctors. Doctor Harper further testified that she made an initial assessment of Jadnerisse based only on a physical examination of the child and the initial X-rays of the child's chest and leg. The doctor testified that those X-rays revealed that Jadnerisse had proximal and distal tibia fractures of her right leg. Significantly, however, she also testified that apart from the injuries to her leg, Jadnerisse appeared to be in normal health for a seven-week-old baby and that her physical examination otherwise was "excellent."

According to Dr. Harper, on the next day, August 12, 2005, Jadnerisse underwent a series of tests, which included a complete skeletal survey, aimed at (1) screening for medical diseases that could have caused the baby to experience fractures either during childbirth or in some other unintentional manner, and (2) ascertaining whether the baby had any other injuries that had gone undetected during the initial X-rays and physical examinations.

The skeletal survey confirmed the existence of the injuries found by the August 11, 2005 X-rays. But, the test further revealed that Jadnerisse had additional serious injuries to various parts of her body.[8] On August 15, 2005, Jadnerisse was X-rayed once again because of concern about some swelling on the fifth fingers of both her hands. The doctor testified that these new films revealed even further injury;[9] Jadnerisse had "buckle fractures"[10]

do asked various medical professionals to diagnose the cause. (Indeed, Jadnerisse was seen at least four times prior to the August 11, 2005 incident.) Whether the doctors ascribed the crying to colic is unclear; it is sufficient to note that in each instance the doctors found nothing abnormal with respect to either child.

7. Delgado, who did not have a car, testified that immediately after she was told of Jadnerisse's condition, she began to look for a ride to the daycare facility, but that her father (who was too busy with work), Garcia (who was too far away to be able to pick her up within a reasonable time), and the company driver (who was going in the opposite direction) all were unavailable to help her. Thus, Delgado was forced to wait until the work shift ended at approximately 3:30 p.m. to leave work and attend to Jadnerisse.

8. Doctor Harper testified that the survey showed that, including those injuries originally diagnosed on August 11, 2005, Jadnerisse suffered from periosteal reaction along the femurs of both legs; corner fractures consistent with classic metaphyseal lesion of the left femur and both the left and right tibia; bucket handle fractures consistent with classic metaphyseal lesion of the right tibia; and cupping deformities of both wrists.

9. The injuries found by the August 15, 2005 X-rays were present on the August 12, 2005 X-rays, but apparently were very difficult to diagnose at that time.

of the fifth digits of both her left and right hands.

Although the doctor could not pinpoint the exact time when any of the injuries were sustained, she testified that the fractures to the right leg were acute, and therefore probably had occurred within twelve to twenty-four hours before Jadnerisse was admitted to Hasbro, which was 5:30 p.m. on August 11, 2005. However, it was the doctor's opinion that the other injuries were older and probably were suffered days or even weeks prior to August 11. Based on this assessment, the doctor concluded that the infant had injuries that were in at least two separate stages of healing, an indication of separate instances of trauma.

Significantly, the doctor also testified that classic metaphyseal lesions such as those seen in Jadnerisse specifically are linked to child abuse and are only rarely caused by other medical conditions. Indeed, she opined that the results of the screening tests themselves tended to rule out medical diseases as a possible cause of the infant's injuries.[11] Because Jadnerisse was too young to walk, and because her particular injuries would have required the application of significant force,[12] the doctor testified that the injuries could not have been caused by a fall or by washing or other normal contact with the child. Doc-

tor Harper concluded that Jadnerisse's injuries were the result of non-accidental trauma, and, given that the injuries would require the use of great strength, trauma most likely inflicted by an adult. Notably, the doctor also testified that because the timing of the injuries—especially the acute leg injury—could not precisely be ascertained, she was unable to rule out either the parents or the daycare provider as the perpetrator of the abuse.

Both parents vehemently denied abusing Jadnerisse, but neither could explain how the baby's injuries occurred. Significantly, Garcia,[13] Delgado, and Dr. Harper were the only witnesses to testify at the hearing.

After all the testimony had been heard and all the evidence was presented, the trial justice issued a written decision in which she found the parents not to be credible witnesses. She also found as a fact, by clear and convincing evidence: (1) that Delgado and Garcia had abused and neglected Jadnerisse and that their abuse constituted "cruel and abusive" treatment of Jadnerisse; (2) that Delgado and Garcia had neglected Adner; and (3) that the daycare provider was not the cause of Jadnerisse's injuries. The trial justice further ordered (1) that the children not be returned to the custody of Delgado and Garcia, but rather be committed to the care, custody, and control of the director of

10. The doctor described a "buckle fracture" as:

"a fracture caused if you were to take a pinky and just bend it backwards and then bone starts to buckle. Basically, if you could imagine taking a twig and starting to bend it back; at some point, it's just going to break on one side first. That is called buckle."

11. The doctor testified that the screening test results were "unremarkable" and therefore ruled out the possibility of medical disease as a cause of the injuries.

12. Doctor Harper described the force necessary to inflict the injuries as a "jerk, twist, or wrenching motion." The doctor further explained: "It requires a substantial force. Orthopedic doctors will tell you when they accidentally cause them in the operating room on kids with club feet, it requires a substantial amount of force, and they feel crunches when it happens."

13. Mostly, Garcia's testimony corroborated the facts as set forth by Delgado regarding the family and their daily routine. It is therefore unnecessary to detail his testimony.

DCYF until further order of the court; and (2) that DCYF was under no obligation to make reasonable efforts to reunify the children with Delgado and Garcia. Delgado and Garcia each filed a timely appeal.

## Standard of Review

To begin, we highlight the fact that the case before us arises from a finding of abuse after a commitment hearing [14] in the Family Court, and not the more frequent appeal from a decree terminating parental rights. Rule 17(b) of the Family Court Rules of Juvenile Proceedings sets forth the standard under which abuse determinations are to be made at a commitment hearing. It says: "[d]etermination that a child is abused, neglected, or dependent shall be made upon clear and convincing evidence." We have held that the clear and convincing standard requires that the fact-finder form a " 'clear conviction without hesitancy of the truth of the precise facts in issue.' " *Parker v. Parker*, 103 R.I. 435, 442, 238 A.2d 57, 61 (1968).

■ When we review an appeal from a decree of the Family Court after a commitment hearing, " 'we examine the record to determine whether legally competent evidence exists in it to support findings made by the trial justice.' " *In re Mackenzie C.*, 877 A.2d 674, 685 (R.I.2005). "These findings 'are entitled to great weight and will not be reversed on appeal unless the trial justice overlooked or misconceived material evidence, or was otherwise clearly wrong.' " *Id.* (quoting *In re Isabella C.*, 852 A.2d 550, 555 (R.I.2004)). Thus, under our deferential standard of review, we must search the record in this case to determine whether legally competent evidence exists to support the trial justice's finding that there was clear and convincing evidence that Delgado and Garcia abused Jadnerisse. *See In re Veronica T.*, 700 A.2d 1366, 1368 (R.I.1997).

## Analysis

■ Delgado and Garcia both argue that the trial justice erred when she found that they abused Jadnerisse because there was no direct evidence produced at trial linking them to the abuse and because the evidence that *was* adduced at trial was insufficient to allow a reasonable inference to be drawn that Delgado and Garcia perpetrated the abuse. We agree.

The trial justice's determination that Jadnerisse was abused by Delgado and Garcia was predicated on two interrelated findings: (1) that a reasonable inference could be drawn that Delgado and Garcia either abused Jadnerisse or had allowed her to be abused because, apart from the daycare provider, they were Jadnerisse's only caretakers and (2) that the daycare provider did not abuse Jadnerisse.

The trial justice relied on this Court's decisions in *In re Chester J.*, 754 A.2d 772 (R.I.2000), and *State v. Durand*, 465 A.2d 762 (R.I.1983), to support her determination that because Delgado and Garcia were the only caretakers of Jadnerisse, apart from the daycare provider, and because there was evidence that Jadnerisse had suffered serious injuries resulting from non-accidental trauma, a reasonable inference could be drawn that the couple either

---

14. The commitment hearing is the vehicle by which the Family Court makes findings about whether a child has been abused or neglected, and therefore should be placed in DCYF custody. Thus, although "preliminary proceedings may involve the placement and continued 'detention' of an at-risk child in DCYF's care pending an adjudication on the neglect or abuse petition[,][t]he commitment trial establishes the more formal commitment of the child to DCYF's 'care, custody, and control' upon an adjudication of abuse or neglect." *In re Christina V.*, 749 A.2d 1105, 1109 (R.I. 2000); *see also* § 40–11–12(a)(b).

abused her or allowed her to be abused. However, *Chester J.* and *Durand* are clearly distinguishable from the case before us, and we believe the trial justice's reliance on them was misplaced.

*Chester J.* involved a petition to terminate parental rights to an infant child, C.J., on the basis of cruel and abusive conduct. C.J. was the victim of horrific injuries, including "multiple fractures of various ages throughout his body." *Chester J.*, 754 A.2d at 773. In addition, C.J. exhibited "numerous bruises and lesions of various ages covering [his] body." *Id.* at 774. C.J.'s mother, who was, together with the father, the only caretakers of C.J., argued that because the state had not proven which parent had inflicted the abuse it had not sustained its burden with respect to her under G.L.1956 § 15–7–7,[15] and therefore could not terminate her parental rights to C.J. Relying on our holding in *In re Frances*, 505 A.2d 1380 (R.I. 1986), we disagreed, and held that "both the quantum and the obscene nature of the abuse was so overwhelming that the trial justice could not ignore the reasonable inferences to be drawn from the evidence." *Chester J.*, 754 A.2d at 777–78. Indeed, we concluded, "the state is not required to prove which parent actually inflicted the abuse[,]" and that "[a]llowing parents to ignore or to stand by while such abuse and neglect occurs is tantamount to the parents inflicting the abuse themselves for purposes of a termination pursuant to § 15–7–7(a)(2)." *Chester J.*, 754 A.2d at 778.

*In re Frances*, also involved a termination of parental rights based on cruel and abusive conduct. In *Frances*, an infant was admitted to the Rhode Island Hospital emergency room because she was "unresponsive, having seizures, extremely dehydrated, with bruises over her head, around her head and upper part of her face and arms." *Frances*, 505 A.2d at 1382.[16] When he testified about the extent of the infant's injuries, the pediatric neurologist who examined her said:

"she was intubated for air with a support. \* \* \* [S]he showed signs of progressive brain swelling, which necessitated further therapy with medication to stop the swelling \* \* \*. There were multiple bruises about her body, particularly the head and left lip. There was soft tissue swelling of the scalp \* \* \*[.] There was evidence of dehydration, and the skin turgor was very poor. In addition, there was evidence of poor hygiene, in that the child's body was dirty. There were caked feces on the genital areas, and I should also mention that the bruises were multiple, and also in various stages of healing, such that some appeared relatively fresh and others looked as if they had been present for days or perhaps even weeks." *Id.*

The mother originally denied ever leaving the baby alone with other adults, but she later changed her position and said that she often left her children in the care of relatives, including her brother and his girlfriend, who were living with her at the time of the infant's injuries. *Id.* at 1383–84. The trial justice found that the baby suffered multiple severe injuries over a period of time, that the mother was the sole caretaker, and that a reasonable inference could be drawn from these facts that

---

**15.** General Laws 1956 § 15–7–7 governs the termination of parental rights.

**16.** Further, approximately two months earlier, the same infant had been admitted to a different hospital because she was "taking seizures." *In re Frances*, 505 A.2d 1380, 1382 (R.I.1986). Although the mother said that the baby "never got better," the mother also made no attempts to follow up on any treatment after this initial admission. *Id.*

the injuries suffered by the child were inflicted by the mother. *Id.* at 1384.

On appeal, the mother argued that the trial justice's findings were erroneous because there was no direct evidence linking her to the abuse and no affirmative evidence that showed that her brother and his girlfriend had not abused the child instead. *Frances*, 505 A.2d at 1384. We disagreed and affirmed the trial justice's ruling on the grounds that such obvious and grotesque injuries would not have escaped the watchful eye of a loving parent. We said:

"[i]t was reasonable for the trial justice to conclude on the basis of the evidence before him that a loving, caring parent would have known the source of the injuries and would have reported this information to physicians or to the police if she had not caused them herself or permitted them to happen." *Id.* at 1385.

In *Durand*, a case stemming not from a termination of parental rights petition, but from a conviction of homicide based on child abuse, we upheld the defendant's conviction even though no direct evidence linked her to her child's injuries. After acknowledging that "it is very difficult in a prosecution for abuse and death of minor children to establish the guilt of a defendant other than by circumstantial evidence because normally * * * there are no eye-witnesses[,]" we held that "where the elements of Child Abuse Syndrome have been established, these circumstances permit an inference to be drawn that the child's sole custodian inflicted the injuries." *Durand*, 465 A.2d at 768 (emphasis omitted).[17] Indeed, we said that "the conclusion that the injuries were caused by the only person in whose custody the child lived flows logical-ly from the totality of the circumstances." *Id.* at 769. This is so, we held, because "a caring parent would not only have been aware of such serious injuries if they had been inflicted by someone else but would have sought proper medical treatment for them." *Id.*

Finally, in *State v. Sivo*, 925 A.2d 901, 2007 WL 1712526, No.2004–358–C.A. (R.I., filed June 15, 2007), a criminal case involving first-degree child abuse, this Court most recently addressed the propriety of drawing inferences in child abuse cases when direct evidence pointing to the perpetrator is not present. *Sivo* involved a child, John Jr., who was admitted to Hasbro hospital suffering from a subdural hematoma. *Id.* at 907. The state's expert doctors testified that the injury was non-accidental, and that, because of the seriousness of the injury, "John Jr. would not have been able to walk, talk, or function immediately after the injury." *Id.* at 912. The doctors also testified that John Jr. suffered these injuries sometime "within twenty-four to forty hours before he was admitted to the hospital * * *." *Id.*

Only his mother and the defendant (who was the mother's boyfriend, but not John Jr.'s father) had access to John Jr. during this time frame. However, there was undisputed evidence that on the morning of the day before John Jr. was admitted to the hospital, his mother left him in the sole custody of the defendant while she went to work. *Sivo*, op. at 912. Significantly, John Jr. was functioning normally at that time. *Id.* When the mother returned home around 6:30 p.m., however, the defendant informed her that John Jr. was in bed sleeping and was very sick. *Id.* The

---

17. Child Abuse Syndrome "means that a child has received repeated and/or serious injuries by non-accidental means; characteristically, these injuries are inflicted by someone who is ostensibly caring for the child." *State v. Durand*, 465 A.2d 762, 767 (R.I.1983) (quoting *People v. Jackson*, 18 Cal.App.3d 504, 95 Cal. Rptr. 919, 921 (1971)).

next morning, "John Jr. did not wake up on his own, was unresponsive, and was unable to hold himself up." *Id.* Based on these facts, "the trial justice found that the state presented sufficient evidence for the jury to reasonably conclude that defendant was guilty beyond a reasonable doubt, and denied defendant's motion for judgment of acquittal." *Id.*

On appeal the defendant argued that "insufficient evidence was presented to allow the jury to find beyond a reasonable doubt that [the child's] injury occurred specifically during the time defendant was caring for him." *Sivo*, op. at 910. We disagreed and held that "[b]ecause John Jr. was walking, talking, and functioning when [the mother] left the house on the morning [of the day before his admission to the hospital], the evidence presented was sufficient to permit a reasonable juror to conclude that John Jr. was in defendant's *exclusive care* all day, that John Jr.'s injury occurred during the time defendant was caring for him, and that it was defendant—being John Jr.'s *lone caretaker*—who caused the nonaccidental head trauma." *Id.* at 912 (emphases added).

At least one of two related factors formed the basis for the reasonable inferences that supported the holdings in each of these cases: (1) the injuries to the child were so obvious and apparent prior to the initial placement of the child with the state that they could not have gone unnoticed by anyone ostensibly caring for the child, and/or (2) the person accused of the abuse was the *sole* custodian and caretaker of the child when the injury took place. When an infant exhibits an array of serious injuries of varying ages that are so clearly open and apparent that they could not have escaped the notice of a caring parent, logic dictates that, regardless of whether direct evidence links the parents to the abuse, a reasonable inference may be drawn that they either inflicted those injuries themselves, or allowed another to do so while they stood by idle. *See Chester J.*, 754 A.2d 772 (R.I.2000); *Frances*, 505 A.2d 1380 (R.I.1986). Further, when serious injury is inflicted upon a child while the child is in the *sole custody* of a particular person, it is also reasonable to conclude that that person perpetrated the abuse. *See State v. Sivo*, 925 A.2d 901, 2007 WL 1712526, No.2004–358–C.A. (R.I., filed June 15, 2007); *State v. Durand*, 465 A.2d 762 (R.I.1983).

Our review of the record in this case leads us to the conclusion that neither of those factors is present. Because the child's injuries were not visible to the naked eye and someone other than the parents had significant access to the child during the time when the injuries probably were inflicted, the inference that only the parents could have inflicted the injuries (or allowed another to do so) was not reasonable.

Here, the evidence was unequivocal that, with the exception of the fracture to her right leg, which led to her initial admission to Hasbro, Jadnerisse's previous injuries were undetectable by Delgado and Garcia. Doctor Harper testified that it was rare that these types of injuries ever would exhibit any swelling at all. Moreover, and more tellingly, none of Jadnerisse's older injuries was discovered by any of the doctors who examined the infant during the first seven weeks of her life.[18] This in-

18. Delgado testified that Jadnerisse was seen by a doctor on June 28, 2005, by the visiting nurse on June 29 and July 5, 2005, and once again by her primary care physician on July 25, 2005. In each instance, the doctors/nurses were unable to find anything physically wrong with Jadnerisse, despite Delgado's repeated indications that the child cried often

cludes Dr. Harper, who described Jadnerisse's physical exam on August 12, apart from the acute injury to her right leg, as "excellent."

Further, the evidence does not support a finding that Delgado and Garcia were the sole caretakers of Jadnerisse: Jadnerisse spent approximately eight hours per day on weekdays in the care of the daycare provider. In her written decision, the trial justice found "no credible evidence to believe that the day care [sic] provider was responsible for the abuse sustained by Jadnerisse[]." We agree that it may be true that no credible evidence was presented by Delgado and Garcia to prove the culpability of the daycare provider, but it is equally true that no evidence was presented by the state to rule out such a determination. In fact, the daycare provider was not even called to testify.

We have said that "the burden of going forward with the evidence may indeed shift from side to side, and this same burden may properly devolve upon a defendant *once the state has developed a prima facie case and has adduced evidence sufficient to make it just that the defendant be required to challenge the proof with excuse or explanation." In re Jarvis*, 766 A.2d 395, 399 (R.I.2001) (quoting *State v.*

*Neary*, 122 R.I. 506, 511–12, 409 A.2d 551, 555 (1979)) (emphasis added). However, it is our opinion that in this case the state did not present a prima facie case of abuse against Delgado and Garcia. The testimony adduced at the hearing revealed only that Jadnerisse was a victim of child abuse, that the injuries were of various ages, that the older injuries were undetectable even to the eyes of trained medical professionals, and that Jadnerisse had three caretakers who could have inflicted her injuries: Delgado, Garcia, and the daycare provider.[19]

Doctor Harper was the sole witness presented by the state at the commitment hearing. She was asked directly whether she could, based on her assessment of Jadnerisse's injuries including the approximate time in which they may have been inflicted, rule out either of the parents or the daycare provider as the culprit in this case. Significantly, she testified that she *could not*. The record further indicates that over a period of approximately four weeks the daycare provider frequently told Delgado to "take this crying baby, I can not stand her,"[20] and that evidence was presented that two teenagers may have been living at the daycare during the time that Jadnerisse was being cared for

and seemed to be in a continuing state of discomfort.

**19.** The trial justice also found Delgado and Garcia to be not credible based on certain "suspicions" raised by their testimony. Specifically, the trial justice based her credibility determination on three aspects of the parents' testimony: (1) that Garcia and Delgado testified that Garcia was never alone with the child except for one occasion that spanned a total of three to five minutes; (2) a "contradiction" between the parents' testimony regarding whether Jadnerisse simply cried a lot or was indeed diagnosed as colicky; and (3) her belief that Garcia should have been more inquisitive during the seven hours in which he was at the hospital on August 11. We need

not delve into the foundation for each of these findings because they cannot, whether taken individually or as a whole, serve as the basis for a finding of abuse, nor do they support an inference upon which a finding of abuse could be based.

**20.** Although the daycare provider did not testify, certain DCYF records, which included reports from various investigating officers regarding Jadnerisse and the events surrounding the August 11 findings contained information about the daycare and the daycare provider. These records were offered into evidence by the state, and were admitted by the court as full exhibits at the commitment hearing.

there.[21] It is our opinion, after a review of the entire record, that the trial justice's finding absolving the daycare provider from abusing Jadnerisse is not supported by the record and was clearly erroneous.

We long have held that "a factfinder may always draw inferences from the evidence presented, but the inferences must be based on some evidence, either direct, or circumstantial." *Durand*, 465 A.2d at 767. Here, the record shows that Delgado clearly was concerned about the fact that her daughter cried so often during the early weeks of her life. Unable to discern the cause, she sought the advice of trained medical professionals on numerous occasions. In each instance, Jadnerisse was given a clean bill of health. In addition, Delgado and Garcia were not the only people with significant access to the child during the time that she was injured. The daycare provider, who, according to the DCYF investigators' report, may have had two teenagers living at the daycare, tended to the child nearly eight hours per day during weekdays, and the state's own pediatric expert could not rule out the daycare provider as a possible perpetrator of the abuse. In our opinion, the evidence presented in this case, whether direct or circumstantial, is insufficient to permit a reasonable inference to be drawn that it was Delgado and Garcia, and not the daycare provider or some other person present at the daycare facility, who abused Jadnerisse. Therefore, we are constrained to hold that the trial justice's finding that Delgado and Garcia abused Jadnerisse was not supported by sufficient legally competent evidence and therefore constituted clear error.[22]

### Conclusion

For the foregoing reasons, we vacate the finding of the Family Court that Delgado and Garcia abused their infant child, Jadnerisse, and return the record of this case to that court.

**21.** Doctor Harper testified that it was possible that Jadnerisse's injuries could have been inflicted by a teenager.

**22.** Our holding today necessarily requires us to also vacate the Family Court's finding that the abuse perpetrated upon Jadnerisse was "cruel and abusive," and the Family Court's order that DCYF was under no obligation to make reasonable efforts to reunify the children with Delgado and Garcia. We note, however, that notwithstanding the order, DCYF continued to formulate case plans with Delgado. At oral arguments, the parties acknowledged that Delgado had cooperated with the case plans and was working toward the goal of reunification.