June 28, 2018

**Supreme Court**

No. 2016-349-Appeal.
(15-271-2)

No. 2016-354-Appeal.
(15-271-3)

In re Madlyn B.                    :

In re Luke B.                      :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re Madlyn B.          :

  In re Luke B.           :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.** A skeletal survey revealed that Luke, a four-month-old infant, had suffered fourteen fractures, for which there was no obvious explanation. Luke's mother, Kimberly Warrington (Kimberly or mother), appeals from a Family Court decree declaring that she neglected and abused her two children, Madlyn and Luke.[1] For the reasons set forth in this opinion, we affirm the decree of the Family Court.

### I

### Facts and Travel

### A

### The Department of Children, Youth and Families' Case

Because Kimberly's primary appellate argument challenges the sufficiency of the evidence, we summarize the relevant testimony elicited at trial in some detail.

Luke was born on October 22, 2014; Madlyn was almost three years old at the time. Luke and Madlyn were patients at Kingstown Pediatrics, a medical practice that included Michelle McCloskey, M.D. Luke was seen by members of Kingstown Pediatrics on October 28,

---

[1] We refer to Ms. Warrington and her children, as well as others involved in the case, by their first names; no disrespect is intended.

November 4, and November 10, 2014, and each appointment resulted in normal evaluations. At the time of trial, Dr. McCloskey had been in the Kingstown Pediatrics practice for approximately two-and-a-half years. By virtue of her care of Luke and Madlyn, Dr. McCloskey was aware of allegations of domestic violence concerning Kimberly and the children's father, Andrew (Andrew or father). Doctor McCloskey described Kimberly as "respectful and cooperative" and "a very caring mother." Between October 2014 and the end of March 2015, Luke was brought to Kingstown Pediatrics for a total of nine visits. On November 21, 2014, Luke was examined by Dr. McCloskey's colleague for his one-month well-check visit. Luke's medical records from that visit reflect that Kimberly reported that Luke was "very fussy" and the records denote, under the assessment section, "[f]ussy infant syndrome." Luke's fifth doctor's visit took place on December 12, and Dr. McCloskey later testified that no signs of distress were observed at that time.

Kimberly returned to work, after a maternity leave, in late December 2014. Kimberly had been employed at Portsmouth High School in Portsmouth, Rhode Island, for five years as a "special educator," leading a behavior program for students who are at risk. She had earned a bachelor's degree in education from Rhode Island College and completed some master's courses at the University of Rhode Island and Rhode Island College. Kimberly routinely worked Monday through Friday from approximately 7:15 a.m. to 2:15 p.m. and arrived home between 3:15 p.m. and 5:30 p.m. each afternoon. For the previous twelve years, she had also coached softball. During the winter season, in the evenings or on weekends, she gave pitching lessons and conducted clinics; and, in the spring, she coached high school softball. Kimberly indicated that she did not go out at night on a regular basis after Luke was born and that she would drink alcohol "[v]ery rarely."

When Kimberly was at work, her mother and father took care of Luke either at Kimberly's home or at their home. Kimberly's mother, Joan Warrington (Mrs. Warrington), typically watched Luke from 6:30 a.m. until 3 p.m., unless Kimberly had afternoon meetings, in which case it might be later. Madlyn was in daycare at North Kingstown Daycare. When Kimberly's parents watched Luke at their home, her father, Lee Warrington (Mr. Warrington), was present and would be left alone with Luke only for short periods of time if Mrs. Warrington had an errand to run. Kimberly noted that two exceptions to this schedule were the last week of December, for Christmas break, and February vacation week, February 16 to 20, 2015, when Kimberly stayed with Luke because she was home from work. Kimberly was also off from work on Martin Luther King Day and January 26, when Madlyn was home sick.

Kimberly was dating a man named Mike Buffrey between January and March 2015, but she testified that it was not serious and that he would not stay at her house.[2] One time, Buffrey watched Luke for approximately thirty minutes while Kimberly ran an errand; when she returned home, Luke "appeared fine," as he remained sleeping in his car seat. When Kimberly coached softball, which would last approximately one hour, she would sometimes bring Madlyn and Luke with her, and Julie Culhane, her friend and neighbor, would watch the children while she coached. Kimberly also testified that, during February vacation, "maybe somebody from the YMCA" watched Luke, but she noted that she could not recall.[3] In addition, Kimberly's sister, Kathryn Warrington, babysat Luke and Madlyn one night when Kimberly attended a birthday

---

[2] As part of the presentation of Kimberly's case, as respondent, she testified and indicated that she and Luke and Madlyn may have slept at Mike Buffrey's house once because it was late, but she noted that she could not recall for sure.

[3] Joshua Cottle, a child protective investigator for the Department of Children, Youth and Families (DCYF), testified that he did not interview any individuals at the YMCA daycare program because he was not informed that Luke ever attended daycare at the YMCA. He was told that Mrs. Warrington watched Luke while Kimberly was at work and that Madlyn attended daycare.

party. During her testimony, when Kimberly was asked if she was Luke's primary caregiver, she responded in the affirmative and stated "I am his mom." She also indicated that, in addition to Mrs. Warrington, Andrew, Andrew's mother and her partner, and Andrew's sister would also care for Luke.

On December 22, 2014, Dr. McCloskey examined Luke for his two-month well-check visit. It was then that Kimberly first noticed a mark on Luke. At that time, she did not know it was a bruise, describing it as a "discoloration," and pointed it out to Dr. McCloskey. Kimberly recalled that Dr. McCloskey was not sure what the mark was, but that the doctor conjectured that it was some discoloration or possibly the "start of a birthmark." Then, on January 30, 2015, Luke was brought to the Kingstown Pediatrics due to a cough, and was diagnosed with bronchiolitis and wheezing and prescribed treatment with a nebulizer. Kimberly again pointed out the same bruise to a nurse practitioner because it was still "yellowing." Kimberly testified that the nurse was similarly unsure as to what the mark was and told her "to just keep an eye on it."

Kimberly testified that, in mid-February, she called Kingstown Pediatrics to ask if she could give Luke rice cereal because she thought that he wanted to eat more. She was told to wait until the four-month well-check visit so that the doctor could examine Luke and make a determination at that time. On February 27, 2015, Dr. McCloskey examined Luke for his four-month well-check visit; and Kimberly, Mrs. Warrington, and Madlyn were present. During the visit, Kimberly alerted Dr. McCloskey to two bruises that she had recently noticed: one on Luke's right buttock and one on his chest. When Dr. McCloskey examined Luke's buttock, his skin appeared "normal"; and the mark on his chest was "a very small fading yellow discoloration that looked at the end of a bruising process." Doctor McCloskey informed Kimberly that,

because the bruise was barely noticeable, "[she] didn't know for sure if it was a resolving bruise at the very end of the healing process or another different type of skin lesion." According to Dr. McCloskey, Kimberly told her that "[s]he thought that [the bruises] could have been due to the car seat straps being too tight." Doctor McCloskey testified, however, that she had never seen an infant of four months suffer bruising from car seat straps. Doctor McCloskey further testified that, during that visit, she did not observe any other bruising or concerning marks on Luke's skin. Kimberly testified that Luke had "a little mark on his bottom" and "tiny little marks on his side[,]" but she explained that she did not bring them to anyone's attention because "it didn't seem like anyone was overly concerned and he never was in any apparent distress, and so [she] thought [Luke] bruise[d] easily * * *."

Doctor McCloskey was concerned at that four-month visit because Luke's weight had decreased to "just above" the tenth percentile, down from the fiftieth percentile at his two-month well-check visit. Doctor McCloskey testified that a drop in percentile is not uncommon, but she noted that it is cause for concern when an infant's growth "decreased by two large standard[-]deviation percentile points[.]" During that visit, Dr. McCloskey discussed Luke's eating and drinking with Kimberly and recommended that she increase his intake. She characterized Kimberly's response to that conversation as "[a]ppropriate."

Ultimately, Dr. McCloskey recommended that Luke have bloodwork done because his bruising was abnormal and unexplained. Mrs. Warrington testified that the bloodwork was requested to determine the cause of Luke's bruising, and recalled that a possible explanation for his bruising was low iron levels. Mrs. Warrington further recalled that Dr. McCloskey did not seem concerned about Luke's bruises. Doctor McCloskey testified that Kimberly "seemed open to taking him [to get bloodwork done] and told [Dr. McCloskey] that she would take him the

next day." Doctor McCloskey also advised Kimberly to call the office if she noticed any new bruising on Luke.

On Monday, March 2, 2015, Kimberly called Kingstown Pediatrics and informed an office secretary that Mrs. Warrington, who had been babysitting Luke, noticed a thumb-sized bruise on Luke's chest. Mrs. Warrington testified that the bruises were not there on Friday, but appeared on Monday and were "blackish/grayish" in color. According to Dr. McCloskey, she received the message that Kimberly had called, and she returned Kimberly's call and left a voice mail indicating her concern regarding the new bruise and asked Kimberly to bring Luke for the bloodwork and back to her office for an examination. Doctor McCloskey testified that Kimberly did not return her phone call that day, nor on the following day, so she called Kimberly again and left a message repeating her concerns and requests that the bloodwork be completed. By the next day, Dr. McCloskey still had not received a return call from Kimberly.

On Thursday, March 5, 2015, Dr. McCloskey again called Kimberly, and Kimberly answered. Doctor McCloskey testified that in her practice she had never had to call a parent three times without receiving a response. Doctor McCloskey relayed her concerns about Luke and her requests for bloodwork and to examine Luke. When Dr. McCloskey mentioned Kimberly's lack of response to her phone calls, she testified that Kimberly replied, "Well, I am a busy woman." Doctor McCloskey explained that at that point in time "[she] was very concerned about Luke and [that she] was further concerned that it didn't seem like mom was too concerned." That same day, Kimberly had the bloodwork completed and brought Luke to Kingstown Pediatrics for an examination. Kimberly testified that she never received any voice

mails from Dr. McCloskey and noted that it was her understanding that she had two weeks to obtain the bloodwork.[4]

Kimberly also did not recall Dr. McCloskey ever expressing any concern over Luke's bruising. Instead, she remembered Dr. McCloskey indicating that "[i]t could be something from like vitamins so let's just check it out first." She only recalled Dr. McCloskey telling her that "[e]verything looks really great but I am concerned about the weight[.]" Mrs. Warrington similarly recalled that Dr. McCloskey did not indicate that the bloodwork was urgent. She explained that, if Dr. McCloskey had expressed urgency, she would have taken Luke to undergo bloodwork because Kimberly had a work commitment.

When Dr. McCloskey examined Luke on March 5, 2015, she found three new bruises, yellow-green in color, "one on each side of his upper chest and one on his abdomen." Upon observing this bruising, Dr. McCloskey recommended that Luke be taken to Hasbro Children's Hospital. According to Dr. McCloskey, Kimberly initially asked if the hospital visit could be postponed until the results of the bloodwork were obtained. Doctor McCloskey testified that she was "too concerned" because "this [was] not normal for his age and he need[ed] to go to the children's hospital right now." Doctor McCloskey testified that Kimberly was worried about driving to the hospital because of the snowy road conditions. Therefore, Dr. McCloskey called an ambulance for Kimberly and Luke "[b]ecause [she] felt very strongly that he needed to go to the hospital for further examination." Doctor McCloskey also examined Madlyn and found no markings. After Kimberly and Luke left in the ambulance for the hospital, Dr. McCloskey called the Department of Children, Youth and Families (DCYF) twenty-four-hour hot line and reported

---

[4] Kimberly disputed at trial that Dr. McCloskey called her three times. She submitted her phone records indicating that she called Kingstown Pediatrics on March 2, 2015, and did not receive a return call until March 5, 2015.

that Luke had unexplained bruising. Overall, Dr. McCloskey affirmed that during all her visits with Luke, Kimberly was cooperative and that Luke appeared to be a "happy baby" who showed no signs of distress.

Luke was admitted through the emergency department at Hasbro Children's Hospital, where he was seen by Dana Kaplan, M.D., a fellow in child-abuse pediatrics. Doctor Kaplan interviewed Kimberly as part of her standard procedure, but she noted that it was difficult to extract information from Kimberly regarding the chronological history of Luke's bruises because of her "emotional state." She described Kimberly as "emotionally labile" because "at one moment she was crying, visibly anxious, shaking and at another moment she would be calm and collected and be able to answer a question." She further testified that "[Kimberly] was tangential at times which mean[t] [the doctor] would ask her a question and she would go off in a different direction and [the doctor] would [frequently] have to redirect her." Kimberly informed Dr. Kaplan that Luke had bruising within the past few days and that she had brought Luke to the pediatrician. Then, Kimberly corrected her statement and noted that the bruises were noticed approximately six to eight weeks ago. Doctor Kaplan observed bruises on Luke's right chest, his left rib cage, and his abdomen. During Dr. Kaplan's physical examination of Luke, she noticed a bump on Luke's upper left extremity "that shouldn't have been there[.]" She ordered a skeletal x-ray to gather more information. Kimberly and Luke stayed in the hospital overnight awaiting the skeletal survey, which was set to take place the following day.

Doctor Kaplan recalled during her testimony that she was concerned about Luke based on Kimberly's statement that she had noticed the bruises six to eight weeks prior. Doctor Kaplan testified that bruises do not take six to eight weeks to heal. Additionally, Dr. Kaplan was concerned because, in reviewing Luke's medical records for his pediatrician visit on February

27, 2015, there was no record of an abdominal bruise; yet, on March 5, he presented with the new abdominal bruise. Kimberly informed Dr. Kaplan that she did not know how the bruising occurred, but after being questioned further, Kimberly posited that because of the location of the bruises, the bruising could have been caused by the car seat straps. Doctor Kaplan investigated the car seat theory by placing Luke in the car seat, but she determined that a car seat buckle would not create "enough of a force * * * to cause bruising in an infant."

According to Dr. Kaplan, Kimberly explained that she "was very overwhelmed," "[t]here was a lot of stress going on in her life," and she and her husband were undergoing a divorce that included "a significant custody battle[.]" Kimberly further explained to Dr. Kaplan that "she felt overwhelmed with both kids and with having to go back to work." Kimberly also indicated that she was the primary caregiver and, in addition, noted that her mother also took care of the children. Kimberly further reported that Luke had short visits with his father in January and March.

At the conclusion of the interview, Kimberly asked Dr. Kaplan, "Am I reacting normal to this?" Doctor Kaplan testified that she did not know how to respond to Kimberly's question. Doctor Kaplan "found it concerning that [Kimberly's] question was not about [Luke's] welfare[,] but [instead] about how she was acting and [Dr. Kaplan's] perception of her." Doctor Kaplan concluded that Kimberly should participate in an inpatient psychiatric-hospital program, which is "an intensive program for women specifically who are postpartum [and] having issues with depression and anxiety."

Joshua Cottle, a DCYF child protective investigator (CPI), also interviewed Kimberly, Mr. and Mrs. Warrington, Andrew's mother and her partner, and Andrew's sister; he also examined Luke and visually assessed Madlyn at the hospital. Kimberly indicated to Cottle that

Luke's bruising could have been caused by the car seat or could have occurred when Luke was picked up. Kimberly described Luke as "a very easy baby to care for, that he consistently [went] to bed on a schedule and that he [ate] consistently on a schedule as well." She did not indicate that Luke was ever fussy or in pain. Kimberly denied abusing Luke. On March 7, 2015, Cottle also met with Andrew.

According to Dr. Kaplan, the results of the skeletal survey showed that Luke had suffered eleven rib fractures, a fracture in his left arm of the radius and the ulna, and a "classic metaphyseal lesion of the right lower extremity." Three of his rib fractures were close to the spine, and the other rib fractures were either on his side or near the front of his rib cage. Doctor Kaplan testified that bruising is "generally apart from the fractures * * * for a variety of reasons." In addition, she noted that bruising in a four-month-old infant is "incredibly" unusual because a baby does not "move enough to cause an injury[.]" Doctor Kaplan opined that Luke's rib fractures may have occurred by compression when Luke was being held. She further concluded that Luke's fractures "occurred outside the realm of normal caretaking."

According to Dr. Kaplan, the fracture on Luke's lower extremity was located where his leg met his foot and appeared to be a chipped bone. Doctor Kaplan called that type of injury a "metaphyseal lesion." Doctor Kaplan explained that there are two mechanisms that can cause "classic metaphyseal lesions." The first is caused by "a very forceful pulling, twisting or wrenching of the extremity." The second is called "sheer injury" that occurs when "a baby and the[ir] legs [are] dangling and they are moving back and forth and the two parts of the bone are rubbing against each other," causing microfractures at the end of the bone. Doctor Kaplan next described the two fractures in Luke's left forearm. She characterized them as "oblique fractures," which occur "when there is * * * a force going straight up and down but also a bone

in motion so there is some motion to the bone to cause that particular type of fracture, not a full[-]on twist but some motion of the bone."

In examining the x-rays, Dr. Kaplan concluded that Luke's fractures were healing and she estimated that they were more than ten days old. She further testified that the fractures "probably" occurred within the past two months, but she noted that she could not provide an exact time frame. She further indicated that an estimation that they occurred in the past three months, on the other hand, "would seem a bit on the longer side." When asked if she could "say with a reasonable degree of medical certainty whether all fourteen fractures occurred at the same time[,]" Dr. Kaplan replied that she "couldn't say that they all occurred at the same time." She explained that, approximately two weeks following the fractures, a callus, or new bone, would have started to form and would have begun to stabilize the fractures. She noted that, during the two weeks following the fractures and before the callus formed, Luke would have experienced significant pain and the injuries would have been swollen. Doctor Kaplan further explained that, during the two-week window, "significant" pain should have been apparent when placing Luke in a Onesie, for example, because his fractures were not stabilized.[5] She postulated that "every time the baby were to breathe, it may have been painful because [he would have been] pressing against those fractures and causing pressure[.]" Doctor Kaplan opined that a caretaker who lived with the child should have noticed that Luke was in pain during that two-week healing period.

Doctor Kaplan noted that the results of the bloodwork ordered by Dr. McCloskey were normal and only indicated that Luke had a "slightly low" vitamin D level. She explained that babies who are deficient in vitamin D can show signs of bones that are not mineralized; however, she determined that Luke's bones were "normally mineralized" and, thus, concluded that his

---

[5] A "Onesie" is "[a] trademark for a one-piece article of clothing for infants * * *." The American Heritage Dictionary of the English Language 1232 (5th ed. 2011).

- 11 -

vitamin D deficiency would not have caused the fourteen fractures. Luke's other markers for bone mineralization, liver function, and noncontrast head CT were all normal. In addition, he was tested by a geneticist for osteogenesis imperfecta, a rare metabolic bone condition, and for rickets, both of which were negative. Doctor Kaplan testified that, in her opinion and to a reasonable degree of medical certainty, the cause of Luke's injuries was abuse.

Doctor Kaplan surmised that none of the fractures could have occurred during the most recent visit with Andrew, on March 1, 2015, because that date was only about six days prior to the hospital visit, and Luke's x-rays showed a "pretty significant callus." She estimated that Luke's injuries occurred at least ten days prior to the x-rays.

In regard to Andrew's contact with the children, he had visited Luke in the hospital when he was born. In addition, he had two visits with Luke prior to a two-hour visit on December 28, 2014. In her text exchanges with Andrew to arrange the visits, Kimberly tried "not to engage in any argumentative type of behaviors." Kimberly "felt safest with supervision" during the children's visits with their father because of the couple's history of domestic violence. A subsequent visit with Andrew took place on January 18, 2015. Andrew testified that the visit was supervised at all times from 9 a.m. to 1 p.m. The next visit lasted two hours and took place on March 1, 2015, from 9 to 11 a.m. Andrew testified that there was a long gap between visits with Luke because one of the visits was only with Madlyn, and the next three proposed visits were snowy days, on two of which, Andrew agreed, the conditions made it too dangerous to drive.

Madlyn had more frequent and longer visits with her father than did Luke. Kimberly testified that, if Luke did not accompany Madlyn on visits with their father, it was because Andrew had not requested to see Luke. However, Andrew testified that he asked to see Luke

every time he saw Madlyn. Andrew noted that Kimberly had custody of Madlyn, but that they had yet to return to the Family Court to set visitation for Luke because he had not been born at the time of the last court date. Andrew's mother testified that she never observed Luke in distress, even when Andrew changed his diapers or dressed him.

At the hospital, on March 6, 2015, Dr. Kaplan and the medical team, including CPI Cottle, informed Kimberly about Luke's fractures and notified her that Luke and Madlyn would be placed in DCYF custody for a seventy-two-hour hold because Cottle made a finding of physical abuse. Kimberly began to cry and stated to Dr. Kaplan, "I should have never told you all those things I told you before." Doctor Kaplan testified that Kimberly's statement "struck [her]" because "[w]e had just told her that her son had been badly injured, a lot of fractures and bruises, and it concerned me that again her focus was that she shouldn't have told me what her mental status was and what her feelings were and her anxiety, and that that became the focus, less so her son's health." Cottle testified that Kimberly "plainly stated that these injuries did not occur at her home and that the injuries must have occurred while on a visitation with Luke's father." Kimberly denied causing the fractures to Luke and testified that she did not know who caused them. Two weeks later, Dr. Kaplan conducted a follow-up examination and noted that Luke did not have any new bruises and that a new skeletal x-ray showed no new injuries.

**B**

**Kimberly's Motion to Dismiss**

After DCYF rested its case, Kimberly moved to dismiss DCYF's abuse and neglect petition, contending that DCYF had failed to prove its case by clear and convincing evidence. DCYF and the Court Appointed Special Advocate (CASA) both objected to Kimberly's motion to dismiss. Kimberly argued that DCYF lacked probable cause to support its petition, and she

pointed to the fact that the police had failed to arrest Kimberly. However, CASA noted that Kimberly's attorney had waived a probable-cause hearing in the Family Court. Kimberly specifically contended that DCYF failed to demonstrate through testimony that she was a "bad" mother, citing to Dr. McCloskey's testimony and the fact that Kimberly "showed up to all the appointments * * *. She took care of her children. They were clothed properly. They were bathed properly." Kimberly further argued that DCYF failed to show that she was overwhelmed by her situation or that she was a drinker or attended a lot of parties. In addition, she contended that DCYF failed to prove that Luke had ever shown any signs of distress. Kimberly analogized the present case to *In re Adner G.*, 925 A.2d 951 (R.I. 2007), and argued that here, as in *In re Adner G.*, DCYF failed to show by clear and convincing evidence that no one other than Kimberly had significant access to Luke. *See In re Adner G.*, 925 A.2d at 957.

In rendering his decision on Kimberly's motion to dismiss, the trial justice indicated that DCYF had to prove its allegations by clear and convincing evidence. He took note of the vehement and unequivocal statements by Kimberly and Mrs. Warrington denying that they had inflicted injury upon Luke. He found that Kimberly and Mrs. Warrington were the main caregivers for Luke. He further noted that the testimony was clear that Andrew had no unsupervised contact with Luke, and he credited paternal grandmother's testimony to that end. The trial justice found both Dr. McCloskey and Dr. Kaplan "very credible, particularly Dr. Kaplan." The trial justice acknowledged Dr. McCloskey's testimony that it was unusual for a four-month-old to have bruising and her concerns that Kimberly had not been responsive to her requests to obtain Luke's bloodwork. He noted Dr. Kaplan's testimony that the fractures, when they had occurred, would have caused Luke distress and substantial pain during any movement of the broken bones, and particularly when he was being bathed or clothed. The trial justice

acknowledged Dr. Kaplan's testimony that the fractures were "between two months of age and ten days before the examination in March of 2015[.]" He also took note of Dr. Kaplan's description of Kimberly's reaction when she was informed that her son had suffered fourteen fractures. The trial justice further noted Dr. Kaplan's conclusion that Kimberly was "labile," inappropriate, and showed a lack of concern for Luke. In addition, he noted Dr. Kaplan's testimony that the fractures were nonaccidental.

Overall, the trial justice characterized the case as circumstantial and, thus, one that required reasonable inferences based on the evidence presented. Because the trial justice found that Kimberly was the primary caregiver, even though other individuals were involved in Luke's caretaking, he concluded by clear and convincing evidence that the cause of Luke's injuries was "likely the mother and that she either knew who caused them or caused them herself[.]" Thus, he found that DCYF had indeed met its burden of proof at that stage of the proceedings, and Kimberly's motion to dismiss was denied.

## C

### Kimberly's Defense

Kimberly called a number of witnesses to testify, some for the second time, as part of her defense, including her sister Kathryn and Mr. and Mrs. Warrington.

Kathryn testified that she had been living with Kimberly and the children. She described Kimberly as a consistently "very caring person" who "always wanted to be a teacher[.]" She noted that her sister regularly had a job and that she traveled, attended college, double-majored, and always continued to play softball. Kathryn coached with her sister and described Kimberly as "great with the team[.]" She described Kimberly's marriage as "rocky at best," but she noted that otherwise things were normal and Kimberly was a "happy mom," particularly after Andrew

moved out. Kimberly had called Kathryn from Hasbro Children's Hospital after she learned of Luke's injuries. Kathryn described Kimberly as "emotionally flooded" during that phone call and speculated that was because "[Kimberly] was being asked question after question after question after question * * * [and she] hadn't eaten in hours." Kathryn testified that the next day, when she picked Kimberly up at the hospital, "[Kimberly] was crying and crying and crying and crying."

Mr. Warrington also testified for the defense. He described Kimberly as "[a] good student [and] good child." He noted that Kimberly was "unhappy at times when she was going through the difficulties with the ex-husband * * *." He explained that she was "a good mother, normal mother, very loving * * *." He noted that he thought Kimberly was handling the stress of her divorce with her two young children "very well." He indicated that he was angry when he learned that Luke had been injured because "somebody did that to [his] grandson or it happened to [his] grandson * * *." When asked who he was angry with, he responded "[h]ow it happened, who did it, whatever, however it happened."

Mrs. Warrington also testified for a second time. She described Kimberly as a "good little girl" with a "normal childhood." She testified that she observed Kimberly undergo two normal pregnancies with Madlyn and Luke, and that, after Luke was born, Kimberly was "a mother that was very happy" who "love[d] her children." Mrs. Warrington described Andrew as "very violent[.]" Mrs. Warrington also indicated that Andrew and Kimberly "could not get along." She testified that "[she] know[s] what kind of person [her] daughter is and [she] know[s] she would never hurt her children." Mrs. Warrington described Luke as "a very, very good baby" and expressed "[t]hat's why I can't believe any of this is going on. He was incredibly good." She indicated that the only time Luke was cranky was when he had a bad cold and cough

and "was on a nebulizer." She further testified that she had "no idea" what happened to Luke and stated "[t]hat's what we're all trying to figure out." She denied causing Luke's injuries.

Brian Hayden, Ph.D., an adjunct professor of psychology at Brown University with a Ph.D. in clinical psychology, also testified during Kimberly's defense. He was contacted by DCYF to conduct an evaluation of Luke's family and had informed Kimberly that he would be reporting back to DCYF. As part of his evaluation, Dr. Hayden met with Kimberly and observed her with her children. In addition, he spoke with Dr. Kaplan. During their first session, on May 2, 2015, Dr. Hayden interviewed Kimberly and administered a series of psychological tests for over three hours. Doctor Hayden first obtained background information from Kimberly. Subsequently, he administered a Rorschach inkblot test in person, and then Kimberly filled out the remainder of the test forms. He explained that the "confluence" of the tests and the interview "make[] [his] interpretation [of the findings] more valid[.]" Kimberly left after she filled out the psychological forms, and then Dr. Hayden evaluated her responses.

Out of respect for Kimberly's privacy, we shall not explicate the results of Dr. Hayden's testing and evaluations. Suffice it to say that the personality tests did not indicate impulsivity or a personality disorder, and Dr. Hayden found Kimberly to be "quite open, genuinely concerned about her children, genuinely confused about what had happened to her child and wanting to know answers[.]"

On May 26, 2015, Dr. Hayden conducted an observation of Kimberly with her two children at the home of Mr. and Mrs. Warrington. Doctor Hayden characterized Kimberly's behavior towards Madlyn during the observation as "perfectly appropriate" and "very loving." He noted some initial wariness by Madlyn when Kimberly first arrived. He indicated that the wariness lasted "a little bit longer than one would have expected[,]" but he attributed it to

Madlyn's likely lack of understanding as to why she was removed from her mother's care. He further observed that Luke appeared "perfectly comfortable" with his mother. He concluded that he witnessed "nothing that would suggest that [Kimberly] would have been abusive towards either of her children." He further noted that, after speaking with Dr. Kaplan regarding the "tremendous distress" that the fractures would have caused Luke, "it just didn't add up." He recommended to DCYF that they continue the children's contact with Kimberly, but have it restricted and supervised because he "couldn't just arbitrarily undo [the DCYF plan]."

Doctor Hayden separately administered the same tests to Andrew, and he also interviewed him and observed him with the children. He conducted a more extensive and detailed aggression questionnaire due to his knowledge of the history of domestic abuse between Andrew and Kimberly. Doctor Hayden concluded that "father has more of an anger issue than mother[.]" Andrew indicated to Dr. Hayden that he wanted to know who injured Luke. During Dr. Hayden's observations of Andrew with the children, the interactions were "mutually constructive, calm, and evidence[d] emotional warmth and bonding." Doctor Hayden recommended to DCYF that Andrew continue to receive supervised visits during the abuse investigation period. He also recommended that the length of those visits be extended by one hour to foster Andrew's bonding with Luke, and that Andrew complete an anger-management class.

Kimberly also presented several witnesses who had known her from two years to over twenty years, either as a friend or as a softball coach. They all testified that she had a reputation in the community for truthfulness. Julie Culhane, one of the witnesses, also testified that, when her children attended softball pitching lessons with Kimberly, which could range from one to

three times per week, she would watch Madlyn and Luke. She noted that she would occasionally be alone with the children in a hallway or at a field.

Additionally, Kimberly testified for a second time and provided a more detailed description of her time with her children. She described that time as "awesome," and she said that her children were "just fantastic." She provided testimony that further elaborated on her prior testimony regarding Dr. McCloskey's allegedly unreturned phone calls. Over CASA's and DCYF's objection, the trial justice admitted, as a full exhibit, Kimberly's phone records. The phone records indicated and Kimberly testified that she had called Kingstown Pediatrics on Monday, March 2, to report the new bruises and did not receive a return call until Thursday, March 5, at 11:30 a.m., contrary to Dr. McCloskey's testimony that she called Kimberly three times that week without receiving a response.

Kimberly also testified that she had placed a call to DCYF on March 2, 2015, the day following Luke's visit with Andrew. She left a message indicating that she had concerns about her children and asked DCYF to return her call. She was worried because Luke had "additional marks on him" and "Madlyn came back from [the] visit with an entirely different change of clothes without real reason" and she thought Madlyn was "exhibiting some odd behaviors."[6] She testified that DCYF did not return her call.

Kimberly clarified that Luke had most recently visited with Andrew on January 18 from 9 a.m. to 1 p.m. and March 1 from 9 to 11 a.m. Kimberly further noted that the children did not

---

[6] Doctor McCloskey noted in Madlyn's medical records, on the same day that Luke was sent to Hasbro Children's Hospital, that Kimberly told her that, when Madlyn returned from her visit with Andrew on March 1, 2015, she had exhibited "strange" behavior, such as "trying to kiss and touch mom's and maternal aunt's private area[s]." Doctor McCloskey further noted that Madlyn's exam was normal, but she indicated, however, that Madlyn's behavior, as described by Kimberly, was "unusual and concerning." She further indicated that in addition to notifying DCYF about Luke's bruising, she also notified DCYF about Madlyn's behavior.

sleep at Andrew's home during those visits. After Kimberly and Mrs. Warrington picked Luke up on March 1, Kimberly readied him for bed, fed him, changed his diaper, and fed him the next morning. Then, later that morning, Mrs. Warrington noticed new bruises on Luke and contacted Kimberly. Kimberly then called Kingstown Pediatrics.

Doctor McCloskey testified on May 24, 2016, that Luke was still her patient and that she had not noticed any new bruising since he was removed from Kimberly's care. In addition, she testified that "[Luke had] made steady inclines back to the [fiftieth] percentile" and "[h]e's doing great. He's growing. His most recent weight was between the [fiftieth] to [seventy-fifth] percentile."

On June 21, 2016, the trial justice issued his decision. He concluded that Kimberly "inflicted or allowed to be inflicted upon these children physical abuse; that both children [were to be] committed to the care, custody and control of the director of DCYF until further order of the court[.]" Kimberly timely filed a notice of appeal on July 7, 2016.

## II

## Standard of Review

"Rule 17(b) of the Family Court Rules of Juvenile Proceedings sets forth the standard under which abuse determinations are to be made[,]" providing that a "[d]etermination that a child is abused, neglected, or dependent shall be made upon clear and convincing evidence." *In re Adner G.*, 925 A.2d 951, 957 (R.I. 2007) (quoting R. Juv. P. 17(b)). "[T]he clear and convincing standard requires that the fact-finder form a 'clear conviction without hesitancy of the truth of the precise facts in issue.'" *Id.* (quoting *Parker v. Parker*, 103 R.I. 435, 442, 238 A.2d 57, 61 (1968)). In our review, "we examine the record to determine whether legally competent evidence exists in it to support findings made by the trial justice." *Id.* (quoting *In re*

*Mackenzie C.*, 877 A.2d 674, 685 (R.I. 2005)). "These findings are entitled to great weight and will not be reversed on appeal unless the trial justice overlooked or misconceived material evidence, or was otherwise clearly wrong." *Id.* (quoting *In re Mackenzie C.*, 877 A.2d at 685). Our review, therefore, is deferential; "we must search the record in this case to determine whether legally competent evidence exists to support the trial justice's finding * * *." *Id.*

## III

## Analysis

On appeal, Kimberly puts forth several assertions: (1) there was insufficient evidence to support an inference of abuse or allowance of abuse by Kimberly, because Luke did not present with pain or injury; (2) Luke's other caretakers should have been held to the same standard of care as a parent; (3) Kimberly's fundamental rights were violated when the children were removed from her care without due process or a reasonable suspicion of abuse or neglect; (4) Dr. McCloskey's and Dr. Kaplan's testimony regarding statements Kimberly had made was inadmissible hearsay because the statements were not made for diagnosis or treatment pursuant to the hearsay exception set forth in Rule 803(4) of the Rhode Island Rules of Evidence; (5) the trial justice erred in denying Kimberly's motion to dismiss when no evidence was presented to support the inference that she was the cause of Luke's fractures; (6) the trial justice overlooked and/or misconceived material evidence; and (7) Kimberly was prejudiced when Andrew was allowed to remain in the courtroom, notwithstanding Kimberly's motion to sequester.

## A

## Evidence of Abuse and Neglect of Luke

Kimberly contends that the trial justice erred in denying her motion to dismiss and in ultimately finding that the evidence supported an inference that she had abused and neglected

Luke. Specifically, Kimberly argues that the trial justice overlooked and misconceived material evidence—namely Dr. Hayden's testimony, evidence that Kimberly "acted responsibly in caring for her children," and Kimberly's phone records. We note, however, that the trial justice thoroughly and methodically examined each of the witnesses' testimony, including the separate testimony of those witnesses who testified for both DCYF and Kimberly.

The trial justice considered Dr. Hayden's testimony and indicated that he was "a strong witness" for Kimberly, particularly in his finding that Kimberly did not possess the type of personality that would cause her to injure Luke. Furthermore, he credited Dr. Hayden's acknowledgment of the limitations of his psychological testing. Thus, we are satisfied that the trial justice did not overlook Dr. Hayden's testimony.

Moreover, the trial justice did not overlook testimony that Kimberly was responsible in caring for her children. Rather, he carefully reviewed the positive testimony by family, friends, and community members that was presented on behalf of Kimberly and noted that the witnesses consistently remarked that she was "an excellent mother" and had "good character" and a "loving nature towards her children." In addition, the trial justice described Kimberly as lighting up when she spoke about her children in her testimony, and he added that "[s]he showed without question that she clearly loves these children."

We further note that, although the trial justice acknowledged the "confusion" regarding phone calls to and from Dr. McCloskey in March 2015, he did not attempt to resolve the discrepancy between Dr. McCloskey's testimony that her calls to Kimberly went unreturned and Kimberly's cell phone records, which only reflected Kimberly's initial phone call to Kingstown Pediatrics and Dr. McCloskey's phone call during which she spoke with Kimberly. We do not conclude therefrom, however, that the trial justice overlooked or misconceived material

evidence. On appeal, Kimberly suggests that the phone records belie the great concern about Luke to which Dr. McCloskey testified at trial. Be that as it may, the sequence of phone calls and messages, and indeed Dr. McCloskey's concern, pale in comparison to the undisputed evidence that Luke sustained fourteen unexplained nonaccidental fractures.

Overall, the trial justice's decision was predicated on three central findings. First, he identified Kimberly and Mrs. Warrington as Luke's primary caregivers. Specifically, he found that both Kimberly and Mrs. Warrington were Luke's primary caregivers during the time Luke's injuries likely occurred. In addition, the trial justice noted that Kimberly and Mrs. Warrington "repeatedly and vehemently denied that either of them were responsible for the [fourteen] fractures suffered by Luke." The trial justice found credible Mrs. Warrington's "strenuous denial that she did any harm to her grandson." In contrast, the trial justice found that Kimberly's "denial as to any knowledge of how [Luke's] injuries were caused [was] not credible * * *." We give both credibility determinations great deference. *See Guertin v. Guertin*, 870 A.2d 1011, 1020 (R.I. 2005) (concluding that "[i]n a trial without a jury, credibility determinations are within the sound discretion of the trial justice").

Second, the trial justice determined that the time frame for Luke's injuries set forth by Dr. Kaplan did not correlate with Luke's visits with Andrew. The trial justice cited the testimony of Kimberly, Andrew, and Dr. Kaplan as the basis for his finding that Andrew did not cause Luke's injuries. In addition, he noted Andrew's mother's testimony that Luke's visits with Andrew were all supervised. The trial justice further acknowledged that Kimberly had called DCYF on March 4, 2015. The trial justice also pointed out the fact that, during the divorce proceedings, Kimberly never accused Andrew of abusing Luke.

Third, he credited Dr. Kaplan's testimony that Luke's injuries were consistent with child abuse and likely caused him substantial pain during the two weeks following the fractures. Kimberly contends, however, that, because the evidence at trial showed that Luke was never observed to be in distress, the inference that she either abused Luke or allowed him to be abused was unsupported because there were other reasonable inferences to be made regarding the cause of Luke's injuries: "metabolic disorder could be the culprit as medicine in this area is still evolving, or, others involved who had sufficient and significant access to Luke over a substantial amount of time could have caused the injuries." The trial justice, however, found Dr. Kaplan's testimony that Luke's fractures were "non[]accidentally caused and were consistent with child physical abuse" to be "convincing, compelling, and weighty[.]" Moreover, the trial justice found that it was "reasonable to infer" that Kimberly, as Luke's primary caregiver, "either perpetuated said physical abuse upon her son or allowed same to occur * * *." We note that Luke had since been seen by Dr. Kaplan, who testified that a new skeletal x-ray had not revealed any new fractures; and, at the time of trial, Luke continued to be in the care of Dr. McCloskey and had suffered no further bruising and had gained weight.

We conclude, after a thorough review of the record, that legally competent evidence exists to support these findings by the trial justice. Therefore, we find no error in the trial justice's denial of Kimberly's motion to dismiss or in his grant of DCYF's petition alleging abuse and neglect.

**B**

**Kimberly's Fundamental Rights and DCYF's Temporary Hold on the Children**

On appeal, Kimberly contends that her fundamental rights under the Fourteenth Amendment to the United States Constitution were violated because DCYF placed a seventy-

two-hour hold on her children without further investigation and without reasonable suspicion after Luke's skeletal survey revealed fourteen fractures. However, Kimberly and Andrew both waived their right to a probable-cause hearing on DCYF's *ex parte* petition. *See* R. Juv. P. 15(c)(5) (providing that a parent has a right to a probable-cause hearing on the *ex parte* petition). Therefore, we conclude that Kimberly's challenge to the temporary hold on the children was not preserved for appeal.

## C

### Luke's Other Caregivers and *In Loco Parentis*

Kimberly maintains that Luke's other caregivers should be held to the same standard of care to which she is held as a parent. In support of her contention, she points to *In re Adner G.*, cited *supra*, which similarly involved a DCYF abuse and neglect petition. *In re Adner G.*, 925 A.2d at 953. There, a justice of the Family Court found that the parents had abused their seven-week-old infant, Jadnerisse. *Id.* at 953, 956. The mother had testified that, since Jadnerisse's birth, she had always been concerned with the frequency of the baby's crying, so she had brought Jadnerisse to see numerous medical professionals and was consistently told that Jadnerisse's crying was normal and that she was healthy. *Id.* at 954. However, a skeletal x-ray of Jadnerisse revealed that she had suffered numerous fractures, in various stages of healing, caused by "non[]accidental trauma." *Id.* at 955, 956. The doctor who examined Jadnerisse testified that Jadnerisse's leg fractures that prompted her admission to the hospital were acute and had probably occurred within the past twelve to twenty four hours. *Id.* at 956. Because of Jadnerisse's acute leg fractures and her other older injuries, the doctor testified that she could not "rule out" the parents or the daycare provider as the cause of her injuries. *Id.* The daycare provider had been caring for Jadnerisse, while mother worked, from morning until approximately

- 25 -

3:30 p.m. *Id.* at 954. Both parents "vehemently denied" causing Jadnerisse's injuries, but were unable to provide an explanation as to how the trauma occurred. *Id.* at 956.

This Court concluded in *In re Adner G.* that a reasonable inference would be deemed supported when either: (1) the injuries to the child were so obvious "that they could not have gone unnoticed by anyone ostensibly caring for the child," or (2) that "the person accused of the abuse was the *sole* custodian and caretaker of the child when the injury took place." *In re Adner G.*, 925 A.2d at 960. After a review of the record, we concluded that neither factor was present to support the inference that Jadnerisse's parents caused her injuries. *Id.* Specifically, we held that "someone other than the parents had significant access to the child during the time when the injuries probably were inflicted" and, therefore, this Court concluded that "the inference that only the parents could have inflicted the injuries (or allowed another to do so) was not reasonable." *Id.* Our conclusion was based on evidence showing that Jadnerisse was cared for approximately eight hours a day during the week by a daycare provider, who did not testify, at a daycare outside of the home, where two teenagers may have been living at the time. *Id.* at 961. Thus, we held that the evidence was "insufficient to permit a reasonable inference to be drawn that it was [the parents], and not the daycare provider or some other person present at the daycare facility, who abused Jadnerisse." *Id.* at 962.

Here, the trial justice distinguished the facts of the present case from those contained in *In re Adner G.* The trial justice found that Luke's only primary caregivers were Kimberly and Mrs. Warrington, who cared for Luke while Kimberly was at work. The trial justice in *In re Adner G.* pointed out that the doctor was unable to "rule out" either the parents or the daycare provider as the perpetrator(s) of the abuse. *Id.* at 956. We note that, here, the trial justice heard testimony from both Kimberly and Mrs. Warrington, unlike in *In re Adner G.*, where the daycare

provider was not called to testify. *Id.* at 961.  In his decision in the present case, the trial justice found credible Mrs. Warrington's denial that she caused any harm to Luke.  On the other hand, he found Kimberly's denial not credible.  Such credibility determinations are "within the sound discretion of the trial justice." *Guertin*, 870 A.2d at 1020.  Therefore, because we have concluded that the trial justice did not overlook or misconceive any material evidence, we will not disturb his credibility determinations.

Moreover, in regard to Kimberly's *in loco parentis* argument, we note that "the law holds [a parent] to a greater level of substantial responsibility and awareness concerning the well-being of [his or her child] than it otherwise might in the case of an adult relative or a stranger." *In re Nicole B.*, 703 A.2d 612, 618 (R.I. 1997) (determining that parents who provided no explanation for their child's critical injuries are held to a higher level of responsibility for their child's well-being due to their status as parents).  Accordingly, we conclude that the trial justice did not err in his findings: Kimberly "was [Luke's] prim[ary] caregiver and [that] it is reasonable to infer that [Kimberly] either perpetrated said physical abuse upon [Luke] or allowed same to occur[.]"

**D**

**Rule 803(4) and the Physicians' Testimony**

Kimberly argues that, pursuant to Rule 803(4) of the Rhode Island Rules of Evidence, only statements made for purposes of diagnosis or treatment are admissible through a physician's testimony as an exception to the hearsay rule.  Specifically, she cites to Dr. Kaplan's testimony that Kimberly asked her, "Am I reacting normal to this?" when Kimberly was informed that Luke had fourteen fractures.  In addition, Kimberly cites to Dr. Kaplan's testimony that Kimberly further stated, "I should have never told you all those things I told you before."  She maintains that these statements were not made for medical diagnosis or treatment and are,

therefore, inadmissible hearsay. Kimberly's counsel, however, failed to object to these statements as hearsay during the trial and therefore failed to preserve the issue for appellate review. *See In re Shy C.*, 126 A.3d 433, 435 (R.I. 2015) (noting that "an issue that has not been raised and articulated previously at trial is not properly preserved for appellate review") (quoting *State v. Gomez*, 848 A.2d 221, 237 (R.I. 2004)).

Kimberly also cites to Dr. McCloskey's testimony that, when she asked Kimberly why she had not returned her phone calls, Kimberly responded: "Well, I am a busy woman." At trial, during Dr. McCloskey's testimony as to Kimberly's statement, the following exchange took place:

> "[DR. MCCLOSKEY:] So I again said that I was concerned about Luke and I would like him to get his blood work. I would like him to come in for an exam, and I told mom about her lack of response to the phone calls.
>
> "[DCYF ATTORNEY:] Did she say anything back to you?
>
> "[DR. MCCLOSKEY:] She did. She said, 'Well, I am a busy woman.'
>
> "[DCYF ATTORNEY:] Okay, and when she responded that way, what were you thinking at that point?
>
> "[DR. MCCLOSKEY:] I was concerned. I, I was very concerned about Luke and I was further concerned that it didn't seem like mom was too concerned.
>
> "[KIMBERLY'S ATTORNEY:] Objection, Judge.

"[THE COURT:] Didn't seem like mom was too concerned may stand. Overruled.

"* * *

"[THE COURT:] You can cross examine as to that.

"[DCYF ATTORNEY:] Thank you.
And then, well, how concerned were you at that point?

"[DR. MCCLOSKEY:] I was very concerned."

We conclude that this exchange at trial demonstrates that Kimberly's counsel did not properly preserve a hearsay objection for this Court's review. The objection was posed immediately following testimony regarding Dr. McCloskey's impression of Kimberly. Furthermore, the trial justice explained his ruling based on his interpretation of Kimberly's counsel's objection as it related to the doctor's impression of Kimberly's level of concern for Luke, not as a hearsay objection. Then, the direct examination of Dr. McCloskey proceeded along the same line of questioning, without further objection or clarification by Kimberly's counsel. "[A] general objection at trial will not suffice to preserve an issue for appeal 'when the context does not supply the specific ground for the objection.'" *In re Jazlyn P.*, 31 A.3d 1273, 1280 (R.I. 2011) (quoting *State v. Feliciano*, 901 A.2d 631, 646 (R.I. 2006)). "[I]n order to satisfy the strictures of our raise-or-waive rule, an evidentiary objection must be *sufficiently focused* so as to call the trial justice's attention to the basis for said objection * * *." *Id.* (quoting *State v. Diefenderfer*, 970 A.2d 12, 30 (R.I. 2009)). Thus, we conclude that the hearsay argument was waived by Kimberly. Moreover, Kimberly's statements are that of a party-opponent and are therefore not deemed hearsay under Rule 801(d)(2) of the Rhode Island Rules

of Evidence.[7] *See In re Brooklyn M.*, 933 A.2d 1113, 1123 (R.I. 2007) (concluding that, because mother, a party, made the contested statements, the statements were admissible as nonhearsay under Rule 801(d)(2)).

**E**

**The Sequestration of Andrew**

On appeal, Kimberly contends that, during her testimony as part of DCYF's case, Andrew was present in the courtroom and "her fear of him contributed to her confusing and often tearful testimony." Prior to the commencement of the trial on December 1, 2015, Kimberly's counsel had moved to sequester all witnesses, and the trial justice asked if anyone who was expected to be a witness in the case was present in the courtroom; CPI Cottle was present and was asked to be excused. However, during Kimberly's "tearful" testimony on February 23, 2016, Kimberly's counsel did not raise any objection to Andrew's presence at that time.[8] *See In re Shy C.*, 126 A.3d at 435 (determining that an issue must be raised and articulated at trial in order for it to be properly preserved for appellate review).

On March 1, 2016, following Andrew's testimony, Kimberly's counsel noted Andrew's presence in the courtroom, objected to it, and argued that Kimberly may call him to testify again as part of her defense and that, therefore, he should be sequestered. Despite this objection, the trial justice allowed Andrew to remain in the courtroom because the proceedings involved his children.

We have recognized that "[a] trial justice is vested with the inherent authority to sequester witnesses during trial testimony for the purpose of preventing that witness from

---

[7] Rule 801(d)(2) of the Rhode Island Rules of Evidence provides that "[a] statement is not hearsay if: * * * [t]he statement is offered against a party and is * * * the party's own statement, in either the party's individual or a representative capacity * * *."

[8] It is not clear from the record that Andrew was even present in court on February 23, 2016.

shaping his or her testimony to conform to that of other witnesses." *State v. Perez*, 882 A.2d 574, 583 (R.I. 2005); R.I. R. Evid. 615.[9] "The decision by a trial justice to exclude a witness from the courtroom is discretionary * * *." *Perez*, 882 A.2d at 583. Thus, due to the discretion afforded to a trial justice in the trial setting, the trial justice's decision regarding the sequestration of Andrew "will not be disturbed absent a clear abuse of that discretion." *Id.* Bearing in mind this deferential standard of review, we conclude that, because the record shows that Andrew was sequestered prior to his testimony, and was allowed to remain in the courtroom only after his testimony had concluded, the trial justice did not abuse his discretion in allowing Andrew to remain in the courtroom following his testimony.

## IV

### Conclusion

For the reasons set forth herein, we affirm the decree of the Family Court. The record may be returned to that tribunal.

---

[9] Rule 615 of the Rhode Island Rules of Evidence provides:

"At the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize the exclusion of (1) a party who is a natural person, or (2) an officer or agent of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his or her cause."

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re Madlyn B.<br><br>In re Luke B. |
| **Case Number** | No. 2016-349-Appeal.<br>(15-271-2)<br><br>No. 2016-354-Appeal.<br>(15-271-3) |
| **Date Opinion Filed** | June 28, 2018 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Washington County Family Court |
| **Judicial Officer From Lower Court** | Associate Justice Stephen J. Capineri |
| **Attorney(s) on Appeal** | For Petitioner:<br><br>Karen A. Clark<br>Department of Children Youth and Families<br><br>Jennifer J. Kelly<br>Court Appointed Special Advocate<br><br>For Respondent:<br><br>Barbara A. Barrow, Esq.<br>Kathleen M. Connell, Esq. |